John Edward MARSH, Plaintiff,

v.

The COMMERCIAL AND SAVINGS BANK OF WINCHESTER, VIRGINIA, Roxy Hockman, and Caroline Hickerson, Defendants.

Civ. A. No. 66-C-88-R.

United States District Court
W. D. Virginia,
Harrisonburg Division.

March 27, 1967.

Alexander N. Apostolou and Harvey S. Lutins, Roanoke, Va., for plaintiff.

Henry Whiting, Kuykendall & Whiting, Winchester, Va., for defendants.

## OPINION AND JUDGMENT

DALTON, Chief Judge.

■ This case involves a controversy between a plaintiff who is a citizen and resident of the State of Nevada and three defendants, a bank and two of its employees. The bank is a Virginia corporation located in Winchester, Virginia, which is in the Western District of Virginia and the two employees are citizens and residents of Virginia. The amount sued for is one-million dollars ($1,000,-000). While no specific amount of special damages is alleged, it is unlikely that the amount of special damages is as much as $10,000. Assuming liability could be established, the amount of general damages, to be added on to any special damages, would be a matter to be determined at trial. Although the result of such a determination is only a matter for speculation now, we will assume that the claim is made in good faith and would, in total, exceed $10,000. Thus this Court has jurisdiction under 28 U.S.C. § 1332(a).

In general, the plaintiff alleges that the defendants are liable for defamation and malicious prosecution of the plaintiff. The complaint grew out of a bank robbery which occurred on September 22, 1965, plaintiff having been identified as the bank robber by the two bank employees. Subsequently he was indicted, tried and found guilty and on April 15, 1966, sentenced to fifteen years in prison. Then after plaintiff had begun serving the sentence, the real bank robber, Charles Abbott Lauritzen, confessed to the crime. The plaintiff was immediately brought to Roanoke and a hearing was held on the basis of the newly discovered evidence. At this hearing the plaintiff was released as a free man on the basis of the testimony of the real bank robber and the two eyewitnesses who acknowledged that they had been mistaken and that the plaintiff was not the man who robbed their bank.

In order to be able to better understand the allegations of plaintiff, hereinafter set out, the basic facts of the case will be recited here.

On September 22, 1965, at approximately two or three minutes after 2:00 p. m. a white male knocked on the front door of the South Branch of the Commercial and Savings Bank of Winchester, Virginia. There were two employees inside, a teller and the branch manager, who were attending to the closing of the bank business for the day. Mrs. Hickerson, the teller, indicated by a nod of the head to the man that the bank was closed. He persisted and she told Mr. Hockman, the branch manager who was at the drive-in window, that someone was at the door. Mr. Hockman went to the glass door, unlocked it and opened it just about twelve inches and asked if he could help the man. When he said "Are you closed?" Mr. Hockman told him that he was and asked if he could be of any assistance. With that the man pushed his way into the bank. Hr. Hockman locked the door again and the robber pulled a gun from his pocket. Mrs. Hickerson sounded a burglar alarm which makes no sound in the bank but rings an alarm in the police station. The robber took a brown paper bag out of his pocket, handed it to Mr. Hockman and told him to "Put the money in the bag and don't say anything." Mrs. Hickerson took the money out of her drawer and laid it on the counter while Mr. Hockman put it in the bag. This continued until the bag was full. Then the robber told Mr. Hockman to get behind the counter and for both of them to lie on the floor. He asked what was in a back room which he saw. He was told that it was a rest room and utility room. Then he went to the front door, encountered some difficulty in getting it unlocked, finally succeeded and left. The

robber was in the bank from about eight to twelve minutes all together.

The F.B.I. agents investigated that day and the next day the agents brought some files of pictures in for the two employees to examine. They did not recognize any of them. Several days later, Mr. Thomas of the F.B.I., brought in some eight or ten more pictures. The pictures were laid out on a desk and Mr. Thomas asked Mr. Hockman, out of the presence of Mrs. Hickerson, if there was anyone there that looked like the bank robber. He spent about a minute or two looking at the pictures and identified one picture as that of the robber. Mrs. Hickerson was not with him at any time he was identifying the pictures. Then Mrs. Hickerson was brought in and after she studied the pictures for about five minutes she identified the same picture that Mr. Hockman had. Neither party had, at this time, ever seen a picture of the man they identified as the robber.

About three months later, both Mr. Hockman and Mrs. Hickerson went to Roanoke at the request of the F.B.I. agents to view a line-up in the Roanoke City jail for the purpose of identifying the bank robber. At this time, Mrs. Hickerson went in first without Mr. Hockman, and spent several minutes viewing the five or six men in the line-up. She stated that the men were all about the same height and weight and were dressed the same. She identified the man who was second from the left as she looked at them from her position directly in front of them. Then without conferring with Mrs. Hickerson, Mr. Hockman came in and spent a period of about fifteen seconds looking at the line-up. He identified the same man that Mrs. Hickerson had identified. At this point both witnesses had seen pictures of John Edward Marsh in the newspapers which had been printed following their identification of Marsh's picture at the bank. They both testified, however, that having seen his picture in the paper had no influence on their identification of Marsh in the line-up. They picked him out because they thought he was the man whom they had seen rob the bank.

Another trip was made to Roanoke by both witnesses for the purpose of testifying to the grand jury. They did not see Marsh on this trip. Then their third trip was made for the purpose of testifying at the trial of John Edward Marsh.

As they affect the libel, slander and insulting words counts of plaintiff's allegations, the proceedings at the trial will not be discussed because the plaintiff concedes in his first brief that absolute privilege operated to allow the witnesses to speak freely about the identification of the robber at the trial. At page two of plaintiff's brief he says:

> With reference to privilege, the case of Darnell v. Davis, 190 Va. 701, 58 S.E.2d 68 (1950) has no application to the instant case. In *Darnell* it was held that words written or spoken during the course of a judicial proceeding, when relevant and pertinent, were absolutely privileged. In the instant case, we are not faced with statements made during the course of a judicial proceeding, but rather statements made prior to and resulting in a judicial proceeding.

However, the trial will be discussed later in this opinion when the court concerns itself with the question of malicious prosecution and how the conviction at the trial affects the question of probable cause, one of the elements which must be lacking in order to make a case of malicious prosecution.

The plaintiff's bill of complaint is lengthy. Rather than set it out completely here, it will suffice to say that plaintiff alleges (1) that the defendant employees libeled and slandered the plaintiff by identifying his picture and later identifying him in person in the line-up as the man who had committed the felony of robbery; (2) that the defendants by their same actions have wronged the plaintiff under the terms of the Virginia insulting words statute; (3) that the defendants are liable in damages to the

plaintiff for the above two counts as well as for malicious prosecution which they say grew out of the identification and their false and malicious testimony at the trial; (4) that the defendants breached a duty owed to plaintiff to act with reasonable care in identifications made in connection with the robbery; and (5) that as a direct and proximate result of all these misdeeds of defendants, plaintiff has been falsely imprisoned and has suffered other harmful consequences for which he says he is entitled to a money judgment.

Having thoroughly studied the allegations of the plaintiff, the answers of the defendants and the supporting briefs filed by each side along with the affidavits, answers to interrogatories and admissions filed pursuant to the motion for summary judgment, the court now addresses the aforesaid allegations and considers the defendants' motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

▬ First, plaintiff contends that defendants are liable in damages to him for their actions which, he alleges, constitute malicious prosecution. As we said in Janney v. Arlan's Department Store, 247 F.Supp. 306 (D.C.1965), and as the plaintiff points out in his most recent brief when he cites that case, the elements of a cause of action for malicious prosecution are said to be as follows:

(1) institution of judicial proceedings by or at the instance of the defendant;

(2) the termination of such proceedings in plaintiff's favor;

(3) actual malice on the part of defendant in instituting the proceedings;

(4) a lack of probable cause for institution of the proceedings. Wiggs v. Farmer, 205 Va. 149, 135 S.E.2d 829 (1964); * * * 34 Am.Jur. Malicious Prosecution § 6 (1941).

Additionally, we will, as we did there, preface our remarks by noting

that actions for malicious prosecution are not favored and courts allow re-

covery only when the requirements for such have been fully complied with. Wiggs v. Farmer, supra. The charge of malicious prosecution is a most difficult one to prove, as *all* of the elements listed above must be present in order for the plaintiff to recover. * * * Freezer v. Miller, 163 Va. 180, 176 S.E. 159, 182 S.E. 250 (1934). (emphasis added)

We turn now to an examination of the first element of the charge: "institution of judicial proceedings by or at the instance of the defendant." The facts show that the defendant bank was robbed and that defendant employees reported it to the police. The F.B.I. came into the picture that same day. We assume that they were contacted by the local police. This is, however, of no real consequence. The significant fact is that once the police were involved in the investigation, the defendant employees did nothing but cooperate in the investigation by giving a description of the robber when asked for one by the police; by assisting an F.B.I. artist to make up a drawing of the robber when asked to do this by the F.B.I.; by participating in the identification of photographs when asked to do so by the F.B.I.; and by participating in the identification of the supposed bank robber in a line-up in Roanoke when asked to do so by the police. The facts show that the bank employees did not swear out the warrant for arrest of the supposed robber. Thus by no stretch of the imagination could it be said that the judicial proceeding was instituted by or at the instance of the defendants.

But the plaintiff urges that this first element of the charge is satisfied if the prosecution was procured by or through the cooperation of the defendant. Rather than deal in a discussion of the definition of the words "procured by or through the cooperation of the defendant", we prefer to take the facts of this case and apply them to the malicious prosecution case law of the highest court in Virginia. The case of King v. Martin, 150 Va. 122, 142 S.E. 358, 359, 360 (1928) involves a malicious prosecution

charge and a state of facts very similar to the case at bar. In that case the defendant, an adult, and his mother were sitting at home when a man came into the house and, with a gun in his hand, went through defendant's pockets and then went into the next room and went through the dresser. The robber got all of Mrs. King's jewelry and some money from the defendant. After the robber left, the defendant and his mother called the police. When the detectives arrived, the defendant gave as good a description to them as he could, but he explained that since the robber had been in a shadow most of the time, while the defendant was in the light, he was not able to distinguish his features very closely, and he limited his description mainly to his size and general appearance. Later the defendant and his mother looked at photographs at the request of police but could not identify any of them. Finally they were asked to go to the police station to participate in a line-up identification. There they identified the robber The evidence is conflicting as to just how positive Mr. King's identification was. After the identification, Mr. King took no affirmative action. He did not request that the identified man be arrested or held. Rather it was the officers who swore out the warrant and had him put in jail. Mr. King participated as a witness before the grand jury and later at the trial. After the accused was acquitted at the trial, he brought the action for malicious prosecution against Mr. King.

The court said in that case that in light of the conflict as to just how positive the identification by the defendant Mr. King, was, it would, in order to put the case in the most favorable light for the plaintiff, assume that the defendant King said in response to a question whether any of the men lined up was the robber, "That is him" and followed this by an affirmative nod of the head when admonished to be sure. In the process of ruling against the plaintiff, after it had made a substantial restatement of the facts, the court said

If this conduct by a citizen, who has been held up and robbed, and this identification of a suspect are sufficient to support an action for malicious prosecution, it would be hard, indeed, to procure testimony with regard to identity in any case, where the fate of the witness from the standpoint of damages was ultimately dependent upon the verdict of a jury in a criminal prosecution, with all the safeguards with which one accused of crime is invested in such a trial.

The court held in this case that "the evidence, in spite of the jury's verdict, as a matter of law, fails to show that the defendant instituted or caused or had anything to do with the prosecution except to appear as a witness when summoned * * *." King v. Martin, supra, 142 S.E. p. 360.

■ The facts in the *King* case compare quite favorably with the facts in the instant case. We note that in *King*, the plaintiff was not arrested until after the line-up identification whereas in our case the arrest took place following the identification of the photographs in the bank and before the line-up identification in Roanoke. This would make no difference in our opinion. Another difference was that in *King* there was some question as to the positiveness with which the witness identified the suspect. But the court, as pointed out above, assumed that the identification was positive. Thus this difference in facts is of no consequence. We therefore feel that the *King* case is controlling as to element number one, thus there was no institution of judicial proceedings by or at the instance of the defendants and the cooperation which they gave the police was not enough to fulfill this first element. Their cooperation was merely the cooperation of a good citizen acting in the interest of keeping law and order.

Now since it is necessary to prove all the elements of malicious prosecution in order for such a cause of action to be successfully maintained, the cause must fail because the first element is wanting as shown and stated above.

■ Additionally we note in passing, that even if it were possible for us to find that the defendant employees' actions did amount to an instigation of the prosecution, we can find absolutely no evidence in the record to support a finding of any actual malice [1] on the part of the employees in their actions regarding the plaintiff. So the cause of action would also fail on this point.

■ And lastly, assuming that the defendants did instigate the prosecution of Marsh, they could not be said to have done so without probable cause. It is now settled law in Virginia that

conviction of a crime before a justice, though reversed upon appeal, is conclusive evidence of probable cause, unless it be shown that it was procured by the defendant through fraud, or by means of testimony which he knew to be false, and bars an action for malicious prosecution.

Burks Pleading and Practice, p. 259, § 150, (4th Edition).

. Plaintiff's latest brief supports this statement of law when he says that once probable cause has been established by a conviction, (even though later there is an acquittal) the only way plaintiff can prove lack of probable cause is to show that there was fraud or perjury on the part of the defendants.

■ We can see nothing in the record which would support plaintiff's allegation of such fraud or perjury. Therefore, it is the opinion of this court that, as to the malicious prosecution count, there is no genuine issue as to any material fact and that the defendants, the parties moving for summary judgment, are entitled to a judgment as a matter of law.

■ The plaintiff alleges also that defendants are liable in damages to him for defamation (i. e., libel and slander) and insulting words under the Virginia insulting words statute. The law in Virginia as pointed out in Carwile v. Richmond Newspapers, 196 Va. 1, 82 S.E.2d 588 (1954) is that

An action for insulting words under Code, § 8–630 is treated precisely as an action for slander or libel, for words actionable *per se,* with one exception, namely, no publication is necessary. The trial of an action for insulting words is completely assimilated to the common law action for libel or slander, and from the standpoint of the Virginia law it is an action for libel or slander. * * *

We will therefore treat the two counts as one from this point on because the words and action alleged to be defamatory are those which are, as plaintiff points out in his last brief, generally considered actionable *per se* in that they impute the commission of a felony to John Marsh.

Since the words uttered by the bank employees to the police at the bank and later at the police line-up are so considered, we are faced with a two part question. First, was the occasion upon which the employees spoke a privileged occasion and if so, was there an abuse of the privilege?

■ These questions are basic because The rule is well settled that when the communication upon which the action is based is one of qualified privilege, the question is not whether the charge was true or false, but only whether the privilege was abused or the language employed was uttered or published with malice, and unless there is evidence from which a jury may fairly conclude there was malice, there can be no recovery.

Peoples Life Ins. Co. of Washington, D. C. v. Talley, 166 Va. 464, 186 S.E. 42, 44 (1936).

■ Of course it is well established that the existence of a privileged (either absolute or qualified) occasion is a question of law to be decided by the Court.

---

1. The question of malice will be further examined in the next section dealing with defamation, privilege and the abuse of qualified privilege.

Chalkley v. Atlantic Coast Line R. Co., 150 Va. 301, 143 S.E. 631, 632 (1928).

■ As to what constitutes a privileged occasion, we find that Peoples v. Talley, supra, quotes, 186 S.E. at page 44, from Newell on Slander and Libel (2nd Ed.) p. 388 as follows:

A privileged communication is one made in good faith upon any subject matter in which the party communicating has an interest or in reference to which he has, or honestly believes he has, a duty, to a person having a corresponding interest or duty, and which contains matter which, without the occasion upon which it is made, would be defamatory and actionable.

The Peoples v. Talley opinion goes on and quotes from Chalkley v. Atlantic, supra,

Where the defendant acts in performance of a duty, legal or social, or in defense of his own interests, the occasion is privileged * * *.

■ From the facts in the case at bar, we see that the two bank employees responded to questions asked them by investigating police officers at the bank, and later in Roanoke at the police station. This participation was a non-officious act of cooperation with the officers who had a legal duty to apprehend the bank robber, while the employees had a social and moral duty to cooperate. We find, as a matter of law, that the two occasions, upon which the plaintiff alleges the defamation occurred, were occasions of qualified privilege.

■ We turn next to the question of abuse of the privilege because as was said in Peoples v. Talley, supra, 186 S.E. p. 44,

It is well recognized that, when the words complained of are uttered upon an occasion of qualified privilege, then in order to recover, it must appear from the evidence that the language used was disproportioned in strength and violence to the occasion, or went beyond the exigency of the occasion, or that the occasion was abused to gratify the ill will of the defendant; in other words, that the defendant was acting from *actual malice* * * * (emphasis added)

And there is a presumption that the defendant was acting in good faith when the occasion is privileged. As was pointed out in Strode v. Clement, 90 Va. 553, 19 S.E. 177, 178 (1894),

Ordinarily, the law implies malice from the use of words defamatory or insulting. But the presumption is the other way where the occasion of the publication is privileged, and the onus is then upon the plaintiff to prove malice in fact.

Thus, in the case at bar, the plaintiff must overcome the presumption that the defendants acted in good faith and without malice.

■ Ordinarily, the question of whether the defendant acted with malice is a question of fact to be presented to the jury. But "where the communication is privileged, unless there is evidence from which a jury may fairly conclude that there was malice, there can be no recovery." Peoples v. Talley, supra, 186 S.E. p. 44.

■ As the court said in National Disabled Soldiers' League v. Haan, 55 App.D.C. 243, 4 F.2d 436, 441 (1925),

If the plaintiff fails to offer evidence of an extrinsic character to prove actual malice on the part of the defendant, in the publication of a libel on a qualifiedly privileged occasion, and if the language of the communication and the circumstances attending its publication by the defendant are as consistent with the nonexistence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant.

Keeping in mind the general principles of law as stated above, we turn to the real question in this case namely, whether there is any evidence from which a jury might infer that the defendant employees were actuated by actual malice in making

their identification of plaintiff. If we find that such evidence does exist, then, of course, the question should go to a jury. Otherwise we will be constrained to rule in the defendants' favor on the motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. That rule states, in part,

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any *material fact* and that the moving party is entitled to a judgment as a matter of law. (emphasis added)

The "material fact", of course, is the issue of malice. Since the defendants filed their motion for summary judgment, both sides have submitted affidavits, interrogatories, admissions, and answers to interrogatories. We are convinced, after studying the record thoroughly, that there is no genuine issue on the question of malice. And as was pointed out in Dyer v. McDougall, 201 F.2d 265, 268 (2 Cir., 1952), when the defendants have succeeded in proving that the plaintiff would not have enough evidence to go to the jury on the material issue, summary judgment is appropriate under Rule 56. There is certainly no substantial evidence on plaintiff's behalf to overcome the presumption against malice which would have to be overcome before plaintiff could prevail in a jury trial.

To elaborate on this point the plaintiff, aside from avowing that it exists, has produced nothing to give the slightest bit of support to the allegation that there was actual malice. The record shows that the defendants did not know, nor had they ever seen, the plaintiff before this robbery took place. Both defendants testified that they had not been pressured in any way to identify Marsh. It shows that the defendants did not receive any increase in pay, reward or promotion for their identification of the plaintiff. It shows that their identification was not necessary in order for the bank to recover its loss from the insurance company. It shows that the defendant employees were not held personally accountable for money stolen in such a robbery. In short, the record shows absolutely no reason to believe the defendant employees were actuated by any malicious motive in making their identification, but on the other hand all the evidence points to the fact that the employees were acting in good faith.

The record also shows that the defendants did not use any excessive or aggressive language in identifying the plaintiff. They merely identified a picture, each out of the presence of the other, which they each independently thought to be the robber. Subsequently, and again at the request of the police, they identified plaintiff in a line-up in the Roanoke City jail. Again the record shows nothing to indicate any actual malice in their identification of plaintiff at this time. Each defendant simply went into the line-up room, viewed the prisoners, left the room and told the officer in charge which one of the men in the line-up they thought was the robber.

Although we believe that the testimony of defendants at the trial is absolutely privileged we point to it also as a further indication of the complete lack of actual malice of the defendants. They both again identified Marsh as the robber, but they testified in such a manner as to impress this court with their complete honesty and candor. Mrs. Hickerson freely admitted for the jury to hear, for instance, that she remembered the robber as having a "cleft" in his chin and then admitted that Marsh had no such cleft in his chin. This kind of testimony convinces us that the witness was trying to be completely honest and helpful. This is far from being motivated by malice.

Additionally, both the defendants promptly and forthrightly admitted their mistake once they had seen the *real* bank robber, Lauritzen. They never displayed any attempt to resist setting the record straight. All of this evidence leaves this Court at a loss to find any evidence of actual malice. And *actual malice* is what

we find is necessary in order to abuse a qualified privilege according to the law in Virgina. Peoples Life Ins. Co. of Washington, D. C. v. Talley, supra, 186 S.E. p. 44.

However, in order to be thorough, we must go one step further. Plaintiff alleges that the false identification was so unreasonable and made with such gross indifference to the rights of plaintiff that it amounted to a wanton and wilful act which is equivalent to malice. We are aware of no Virginia defamation case in which the holding turns on such a definition of malice. That would be "constructive malice" and the law in Virginia, as pointed out above, requires actual malice. And even if there were cases in Virginia that held that constructive malice was sufficient to abuse a qualified privilege, we could not let the case at bar go to a jury. In our opinion, there is nothing in the allegations of plaintiff or in the record at any point in this case up to this day which puts the question of "unreasonableness" or "gross indifference" sufficiently in issue to require a jury trial.

Thus, as to the defamation and insulting words count, we find that there is no genuine issue as to any material fact and that the defendant is entitled to a judgment as a matter of law.

To conclude this is simply a case of two witnesses to a crime making a mistaken identification of a man who resembled the actual robber. To subject the witnesses and their employer to a civil trial based on the mistake which the witnesses made would do a great injustice not only to the defendants who, but for their willingness to cooperate as good citizens in the investigation of a felony, would not be involved today, but also to society which demands and deserves the proper investigation of crimes. Surely a witness to a crime does not have to wait until a verdict of guilty before he can rest assured that his good faith testimony against a defendant cannot be used against him in a defamation suit. If such were the case, our system of justice would be way out of balance.

Witnesses to crime must be permitted and encouraged to speak freely in good faith in order to help protect society from crime. But this does not leave the plaintiff without relief.

 Congress has provided the right for such people, as this plaintiff, who have been wronged in the name of society, to seek relief in the Court of Claims under 28 U.S.C. § 1495 and § 2513.

In consideration of the above opinion, it is adjudged and ordered that the defendants' motion for summary judgment be and the same hereby is granted.

The Clerk of the Court is directed to send a certified copy of this opinion and order to counsel of record.