**David EVANS, Plaintiff,**

v.

**Joseph W. LAWSON, Defendant.**

**Civ. A. No. 72–C–101–A.**

United States District Court,
W. D. Virginia,
Abingdon Division.

Oct. 16, 1972.

Carl E. McAfee, Cline, McAfee, Adkins & Gillenwater, Norton, Va., for plaintiff.

John A. K. Donovan, Donovan, Turnbull, Brophy & Burns, Falls Church, Va., and George M. Warren, Jr., Warren & Bowie, Bristol, Va., for defendant.

## OPINION and JUDGMENT

DALTON, District Judge.

The present suit is one of libel and slander brought by the plaintiff, a citizen of Texas, against the defendant, a Virginia citizen. The amount in controversy exceeds the jurisdictional requirement, plaintiff having alleged his damages to be $750,000.

The defendant has moved to dismiss the case for failure to state a cause of

action upon which relief may be granted, that the statements made were privileged, and that the words are not libelous per se.

This court must decide if the complaint, viewed most favorably with respect to the plaintiff, sets forth on its face allegations which, if proved, would entitle the plaintiff to recovery.

The suit concerns two letters [1] sent to various members of Lions International. The first letter was sent to all past dis-

[1]. January 10, 1972
Dear Fellow Past District Governors:
My sincere thanks to your overwhelming response to my recent communication on the happenings in Las Vegas.
I am convinced that Lionism will regain its stature in the world and we will become more successful in Virginia Lionism.
*Many of you know we finished in a negative position in Virginia last year.* We lost more Lions than we gained. One District came out a 36-minus.
Two 'top-notch fabricated stories' are going around about the happenings in Las Vegas:
1—A Lion that had too much to drink mistook a credential cardboard box for a cuspidor and vomited all over the credential cards. Thus, these cards were not counted.
I checked this out with Lions International and I find that all boxes were sealed and shipped to Chicago. When these boxes were opened—*there was not vomit or stain on any credential card.*
2—Two Past Presidents stuffed the ballot box.
This was also checked out and it was found that these two alleged Past Presidents had nothing to do with the election and were not in the voting room.
The fact remains that there were 128 more votes in the ballot box than there were eligible delegates voting.
Fellow Lions, in spite of Chicago and the happenings at Las Vegas—let's try to finish this Lions year in Virginia on a plus basis. *Let's try to extoll Lionism* and not control Lionism. If we can do this we will continue to meet the needs of many of those in need—through Lionism. We will not find many of those who have been discouraged and have not been attending our conventions back with us.
May 1972 fulfill your fondest dreams of health, happiness, and prosperity.
Most sincerely,
Joseph W. Lawson
JWL/jj
Dear Fellow Lion of Virginia:
Many of you have called or written me relative to the happenings at Las Vegas. The first report from the voting showed Third Vice President candidate John Bal-
bo, to have won by a majority of 69 votes.
Past International Director, Dr. William Waite requested a recount.
Lions who were not official counters at the convention assisted and observed this recount.
The results of the recount gave John Balbo 2,722 votes, Al Schock 2,689 votes. The other candidates 1,317 votes. Total 6,727 votes. John Balbo, a majority of 33 votes instead of the 69 votes majority first reported.
A committee was appointed to investigate the Las Vegas voting record. The committee met at Lions International headquarters, Oak Brook, Illinois, July 27, 1971.
A general chairman and committees were appointed to check the ballots from Las Vegas convention, check the certified voting delegate cards, check the credential stubs retained by Lions International when the delegates received a certified voting delegate card. Following the appointment of these committees, the following procedures took place:
Each ballot was again counted and the count was 2,721 for John Balbo. 2,689 for Al Schock. 1,317 for Brennan, Lundberg and void ballots—making the total ballots cast 6,727. Thus, by this recount one more vote was found for Al Schock. The committee checking the certified voting delegate cards, and these are the cards that the delegates hand to the teller when they receive their ballots to vote, found that there were 6,599 of these certified voting delegate cards— which is 128 less in number than the ballots voted. In other words, there were 128 more ballots placed in the ballot box than there were certified Lions voting.
Also, in addition to the 128 more ballots than certified Lions voting, there were 374 certified voting delegate cards that had many discrepancies:
1. 202 of these cards had no names thereon.
2. 43 cards were complete except there were no initials to certify the delegates' voting stamp.
3. 60 of these cards were complete except they were not marked as to whether they were an alternate or a delegate.

4. 11 cards marked complete but were marked non-voting alternate.

5. 10 cards were marked alternate.

6. 10 cards had no state or county marked.

7. 9 cards had the name scratched off and another name scribbled in.

8. 5 cards were completely blank except they had the official voting stamp affixed.

9. 2 cards had no club or state record at all.

10. 1 card had only the club, no name, and no state or district.

11. 1 card had no stamp whatsoever.

12. The committee also checked the stubs that were taken from the certified voting delegate card—it was found that many of these were not properly filled out—some had the President's name or Secretary's name completely missing. The result of the recount and careful examination of the total paperwork in the election again revealed that there were 128 more ballots in the boxes than there were certified voters voting.

There were 374 improperly filled-out certified voting delegate cards—making a total of 502 questionable ballots. John Balbo was certified as being elected with 39% of the total votes cast.

Lions flew in from Illinois the morning of the Election. These Lions had not taken part in the Convention at all but were permitted to vote up until the voting polls were closed. Interviews with these voting Lions from Illinois revealed that their expenses were not paid by them. A dedicated Lion who is an employee of Lions International, when asked what the true legal vote count should have been replied, Al Schock won by at least 200 votes.

The Board of Directors of Lions International met the week of October 15th to again examine the results of the election and listen to representatives of various Lions Clubs to ascertain what should be done to erase this blight on Lions International.

The Board, realizing that something drastically and horribly wrong had occurred at Las Vegas—despite its determination not to admit this fact—has responded by listing a number of remedial measures which it proposes introducing in future elections. Later in this report you will see why the Board of Directors did nothing more.

You need to know the events leading to the Las Vegas irregularities and the action taken by the Board in October.

The campaign slogans of Robert McCullough running for Third Vice President in 1967 in Chicago were 'Leave it up to the lay Lion' and 'Free and open elections and no Deals'. In other words, the lay Lion through properly-conducted election processes should run Lions International.

In every democratically-run organization, there should be an independent, judicious and final authority.

In the constitution of Lions International we had a Board of Governors which served as the supreme court and to whom could be appealed the actions of Lions International through the Board of Directors. At our convention in Dallas, Texas in 1968, it was proposed to remove the Board of Governors from the constitution of Lions International. Many Lions fearing the developing of a Political Dictatorship, fought this amendment and it was overwhelmingly defeated on the floor of the convention.

A 'New Constitution' was presented to the Tokyo Convention in 1969. However, the 'Board of Governors'—the Supreme Court of Lionism—was surreptitiously left out. This new constitution was approved by the Tokyo Convention and now there is no 'Supreme Court' to whom an injustice might be appealed.

A director is elected to represent the Lions of the world and to establish and maintain the policies of Lionism. However, the President of Lions International, Robert McCullough, not trusting the 'lay Lion' or his Board of Directors, requested in Atlantic City in 1970 his Board of Directors abrogate their responsibility to the Lions of the world and to the employees of Lions International and thus delegate their authority to the Executive Committee. The resolution passed by the Board: That the Board delegate to the Executive Committee the full authority to determine various areas of responsibility in the administrative positions in our association. This would include job analysis, salary structure, and any other matters they deem necessary for the efficient operation of our association. (underlining added)

The Executive Committee is composed of five Lions: President, three Vice Presidents and a representative appointed by the President from the Board of Directors. Thus, three Lions on the Executive Committee are given complete control. This makes the Board of Directors, all employees of Lions International and all Lions around the world subservient to three Lions on the Executive Committee.

This same Board action, delegating to the Executive Committee the full authority to determine 'any other matters they deem necessary for the efficient opera-

trict governors of this organization, and the second was sent to all Virginia members of Lions International. The plaintiff is currently president of the international organization and was at the time of the letters one of the organization's vice-presidents. The defendant was the past international director of the organization.

The letters, which are fully set forth in the footnote, concern certain problems of voting irregularities at the organization's Las Vegas convention. The second letter also voiced the defendant's opposition to the elimination of the Board of Governors, who apparently act as a supreme court for the organization, from the new constitution. The defendant expressed his view that Lions International had, since the elimination of the Board of Governors, departed from its stated goals and policies and had become more obsessed with politics within the organization. The portion of the letter directed towards the plaintiff appears at the bottom of page four of the second letter and reads as follows:

"It now appears that, beginning with the election of David Evans as Third Vice-President, and at all times since then (Dick Bryan, an exception, and an example of a President of good will being pilloried) the volunteer nature of our once dignified and unselfish host of men has been stolen from us, and has deteriorated to the ownership of political power seekers.

If you subscribe to these feelings and wish to join in an attempt at rehabilitation, please sign and return the bottom part of this letter with your pledge of supporting Lionism."

The plaintiff contends that because of this section of the letter, he suffered humiliation, embarrassment, mental agony, injury to his feelings, reputation, and good name, and has been held in contempt, calumny and ridicule. From the plaintiff's complaint it is clear that only members of the organization saw the second letter which contained his name. This court is therefore faced with the following question—what are the bounds of an individual's right to speak out

---

*tion of our association'* was again requested in Las Vegas in June, 1971, by President Uplinger.

This was again approved by the Board. Thus, the Board voted to continue to be a subservient body divorcing themselves from their elected responsibilities and gave their privileged responsibility of representative service to the Executive Committee.

An abused employee discharged for political or personal reasons or a candidate who believed his election was stolen from him, really has no one to whom he can appeal.

Lions of the world are appalled by the ominous black cloud which hangs menacingly over our voluntary association. The best interest of our beloved association demands that we clear the air of this suspicion and show the world that Lions International, the world's greatest humanitarian organization, must be above reproach.

Some of you may not want to hear these facts. But, to hear nothing but what is pleasing to one is to make a pillow of the mind.

Most Lions have affiliated with our once splendid organization because they have that mysterious urge to serve as volunteers for aid to the less fortunate, the community, the state and the nation and international without hope of personal reward, and to perform this work in happly association with others of a like mind and heart.

It now appears that, beginning with the election of David Evans as Third Vice President, and at all times since then (Dick Bryan, an exception, and an example of a President of goodwill being pilloried) the volunteer nature of our once dignified and unselfish host of men has been stolen from us, and has deteriorated to the ownership of political power seekers.

If you subscribe to these feelings and wish to join in an attempt at rehabilitation, please sign and return the bottom part of this letter with your pledge of supporting Lionism.

Yours faithfully in volunteer Lionism.
Sincerely,
Joseph W. Lawson
P.O. Box 919
Bristol, Virginia 24201
JWL/jj

and voice his opinion concerning the ability and conduct of an individual, who is not considered a public official or a public figure, but who does hold a high office in a private organization of which the speaker is also a member, to other members of this organization and to people in general? Has an individual's acceptance of high office in a private organization resulted in a decrease of protection against invasions of privacy and defamation of character?

The conflict between an individual's First Amendment right of free speech and his right to privacy and freedom from defamation has in recent years received much attention by the Supreme Court. *See* Greenbelt Cooperative Publishing Ass'n., Inc. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); reh. denied, Associated Press v. Walker, 389 U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197 (1967) cert. denied, sub nom. Walker v. Associated Press, 391 U.S. 966, 88 S.Ct. 2036, 20 L.Ed.2d 880 (1968); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The first cases dealing with this conflict concerned public officials—those people who are elected or appointed to positions in government. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) was the landmark case in this area. The Court expressed its commitment to the idea that in a free and democratic society there should exist uninhibited, robust, and wide open public debates of the issues and candidates even though such discussion might well include "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." The Court felt that people must be allowed their right to criticize. The thrust of *New York Times* is that

when the interest of the public in public discussion is particularly strong, then the Constitution limits the protection afforded by the laws of defamation. Rosenblatt v. Baer, 383 U.S. 75, 86, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).

The cases which deal with criticism of public officials hold that a state cannot allow recovery to public officials for defamatory comments relating to his official conduct unless the official can prove actual malice, or that it was published with knowledge of its falsity or with reckless disregard to its validity or non-validity. St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). It is important to notice that this test only applies to statements made concerning conduct in one's official capacity. Therefore, while public officials are less protected, they are not wholly unprotected. The statement must relate to the individual's public office and not to something purely personal.

The area into which the court moved after *New York Times* and *St. Amant* concerned people who did not hold public office, but who had for some reason come into the public's eye as spokesmen for the public generally on various issues and topics. These people were termed public figures. The first case concerning such people was Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), reh. denied, Associated Press v. Walker, 389 U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197 (1967), cert. denied sub nom. Walker v. Associated Press, 391 U.S. 966, 88 S.Ct. 2036, 20 L.Ed.2d 880 (1968).

In *Butts* the Court held that a public figure who was not a public official could also recover damages for defamatory falsehoods where there is an

apparent and substantial danger to the person's reputation, after a showing of unreasonable conduct which would be an extreme departure from the general standards of investigation and reporting practiced by responsible publishers. The *New York Times* decision, the court felt, should not be limited only to public officials. Therefore the principals of *New York Times* were applied to public figures. Accordingly, the Court in Greenbelt Cooperative Publishing Ass'n., Inc. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) held that a plaintiff public figure must establish the utter falseness of the statement and that they were made with malice or with knowledge of its falsity or in reckless disregard of its truth or lack of truth. These are the same tests which were applied in *New York Times*. Therefore, it is clear that the designation of a person as a public figure does result in a decrease of protection against invasions of privacy and defamation of character. Tilton v. Cowles Publishing Co., 76 Wash.2d 707, 459 P.2d 8 (1969).

When the Court applied the rules of *New York Times* concerning public officials to public figures, it also continued the proposition that statements about these people were only protected insofar as they related to the public activities, duties, responsibilities, actions, qualifications, and ability of these people. Comments directed more towards the public official or figure in his personal and private life were not protected. The statements must bear some relation to the individual's public role.

In the present case we have neither a public official nor a true public figure. The plaintiff, because of his organizational position, might be more aptly called an organization figure. Aside from his friends, he is well known only to those people within his organization and only because of his position. The question then is whether these people are subject to similar restrictions concerning their right to redress for alleg-edly defamatory statement as described in *New York Times* and *Butts?*

■ Again there must be a balance between competing interests. On the one hand such individuals, because they occupy less than a public figure position, desire to have and should have a high degree of protection of their right to privacy and freedom from defamation. Yet, on the other hand, the members of the organization have the guaranteed right of free speech. These people should be allowed their right to dissent. It appears to this court that one who is termed an organization figure should not be allowed to employ his rights against defamation and invasion of privacy to censure, control, and suppress the right of the members of his organization to disagree and dissent with him and his policies in his organizational capacity. The democratic nature of our society is not limited solely to government, but is pervasive throughout its entire structure.

The effect of *New York Times* and *Butts* has been that within limits statements made concerning public officials and figures are qualifiedly privileged. That is to say that but for the existence of this right of individuals under the First Amendment as interpreted by the Supreme Court, there would exist a course of action for libel and slander.

■ The rule seems to be that when the communication upon which the action is based is one of qualified privilege, then the question is not whether the charge is true or false, but only whether the privilege has been abused to the extent that there exists actual malice, or an utterance with knowledge of its falsity, or a complete and utter disregard for its truth or falseness. Marsh v. Commercial and Savings Bank of Winchester, Va., 265 F.Supp. 614 (W.D. Va.1967). See, e.g., Greenbelt Cooperative Publishing Ass'n., Inc. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); St. Amant v. Thompson, 390

286

U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). It also appears to be the rule that a privileged communication must be made in good faith upon a subject matter in which the communicating party has an interest, or honestly believes he has such an interest or duty to a person having a corresponding interest or duty and which contains defamatory information which would be actionable had the privilege not existed. Marsh v. Commercial and Savings Bank of Winchester, Va., 265 F.Supp. 614 (W.D.Va. 1967).

An examination of *New York Times, St. Amant, Butts* and other cases reveals that they are in accordance with this statement, although they contain no specific language to this effect. The general proposition is that the communication must be made upon a topic in which the speaker has an interest. Because the general public has an interest in all public affairs, every person can be deemed to have an interest in the topic. Likewise, the speaker must communicate to someone having a corresponding interest; yet, because the general public has an interest in these people, they have a corresponding interest with the speaker. Thus with respect to public officials and figures, the public at large is given the right to dissent. In the present case, because the plaintiff is not a public figure or public official, the class of people who have an interest in the topic is not as broad and extensive. Therefore if the ideas expressed in *New York Times* and *Butts* are to be extended to organization figures, there must be some restrictions placed on who may dissent and to whom such dissent may be expressed.

■ After careful consideration and analysis of the problem, this court holds that people who, by assuming their leadership role, may be classified as organization figures, have decreased their right to privacy and freedom from defamation. These rights, however, have been decreased only with respect to the other members of or people who have a direct, substantial, and significant interest in the same organization. Following *New York Times* and *Butts,* the Constitutional limitation of the protection afforded by the laws of defamation extends only to comments criticism, and dissent with respect to this particular individual's capacity and function within the organization. Only criticism of an individual in his official capacity will be privileged. Personal attacks will not be tolerated by the courts. Thus, comments and criticism of an organization's top leaders, by members of the same organization or by outside individuals whose relationship to the organization is direct, substantial, and significant, to other members of the same organization or people having a direct, substantial, and significant interest in this organization which concern actions, decisions, policy and other related matters taken, done, or acted upon by these people in their official capacity will be protected and privileged.

■ In order for these people to recover in defamation action, these individuals must prove 1) actual malice, or 2) an utter disregard for the truth or falseness of the statement, or 3) knowledge of its falseness, or 4) that the statement is not directed at an organization figure in his official capacity with the organization, or 5) that the statement was made by someone not substantially, directly and significantly interested in or a member of the organization or 6) that the statement, although made by someone directly, substantially and significantly interested in or a member of the organization, was made or directed to one or more persons who are not members of or directly, substantially, and significantly interested in this organization.

■ Applying principals to the present case, the court finds that the reference to the plaintiff was made by a

member of the plaintiff's organization to other members of the same organization and was directed at the plaintiff in his official capacity with the organization. The plaintiff's name appeared only once in a four page letter. The tone of the letter was such as to indicate a displeasure and dissatisfaction with the organization itself more than with the plaintiff in his official capacity. The defendant is expressing more his opinion about the organization than he is asserting an actual fact. In his opinion the organization has become more political than charitable.

Being an opinion, it is not subject to a jury finding of truth or falseness. Indeed, comments such as the defendant has expressed about this organization and its leader are precisely the type which the court feels must be protected if the democratic nature of our society is to continue. The court can find no actual malice, nor as previously stated is it subject to a finding of truth or falseness. Having met the criteria established by this court for organization figures, the court finds that the defendant's statement was privileged and as such there can be no recovery under the law of defamation, nor from the plaintiff's complaint is there sufficient evidence upon which a jury could find malice or any one of the other above enumerated grounds.

The effect of this opinion is that leaders of private organizations may be made the object of and subject of criticism and attack by other people whose interest in the organization is direct, substantial, and significant and that by assuming these high positions the law will not afford them a remedy for every adverse sarcastic comment made against them in their official capacity. The defendant's motion to dismiss is hereby granted, and each party to pay their own cost.