**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RODNEY BRICE,
Plaintiff-Appellee,

v.

E. J. NKARU; SAFEWAY,
INCORPORATED,
Defendants-Appellants.

No. 99-1646

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-98-313-PJM)

Argued: April 5, 2000

Decided: July 12, 2000

Before MOTZ and KING, Circuit Judges, and
John C. GODBOLD, Senior Circuit Judge of the
United States Court of Appeals for the Eleventh Circuit,
sitting by designation.

_____

Reversed by published opinion. Judge King wrote the opinion, in
which Judge Motz and Senior Judge Godbold joined.

_____

**COUNSEL**

**ARGUED:** Jerome Charles Schaefer, O'BRIEN, BUTLER,
MCCONIHE & SCHAEFER, P.L.L.C., Washington, D.C., for Appel-
lants. Chris Asher, UNIVERSAL LAW CENTER, Washington, D.C.,
for Appellee.

**OPINION**

KING, Circuit Judge:

Rodney Brice sued Safeway, Inc. ("Safeway") and E. J. Nkaru in the District of Maryland, alleging that Nkaru, a security guard in a Safeway grocery store in Falls Church, Virginia, maliciously caused Brice's prosecution for having forged and uttered a Safeway courtesy card.[1] A jury found Nkaru and Safeway liable and returned a $500,000 verdict in favor of Brice. Brice thereafter accepted a remittitur to the sum of $100,000 and judgment was entered in his favor.

Nkaru and Safeway[2] appeal, asserting that they are entitled to judgment as a matter of law. As explained herein, we agree and reverse the district court's judgment.

I.

A.

On September 16, 1994, Nkaru reported an incident at the Safeway market to Officer Marcus Wigglesworth of the Alexandria City Police Department. Nkaru indicated that, on the previous day, a black male had presented a false Safeway courtesy card application in the name of one Kenneth McIntyre, and he had attempted to cash a check. According to Wigglesworth's incident report, Nkaru recognized the man from a similar incident occurring approximately one year earlier in another Safeway market. Nkaru provided Officer Wigglesworth with the police identification number assigned to the previous case (the "Weir" case), which Wigglesworth recorded in his incident

_____

[1] Brice was charged and prosecuted for violating Va. Code Ann. § 18.2-172 ("If any person forge any writing, other than such as is mentioned in §§ 18.2-168 [forging public records] and 18.2-170 [forging coin or bank notes], to the prejudice of another's right, or utter, or attempt to employ as true, such forged writing, knowing it to be forged, he shall be guilty of a Class 5 felony.").

[2] Safeway's liability is premised on the acts of its agent Nkaru, and they are jointly and severally liable for the jury's award. For simplicity, we refer to Appellants Nkaru and Safeway as "Nkaru."

report. Wigglesworth's initial investigation results, included in his incident report, established that Brice's Social Security number was on the fictitious courtesy card application. Officer Wigglesworth concluded his report by requesting a follow-up investigation on the case.

Detective Andrew Jessup, also of the Alexandria City Police Department, thereafter continued the investigation. He concluded that a false name and address were on the Safeway courtesy card application and the telephone number on the application was that of a law firm in the District of Columbia. Having obtained Brice's name from Officer Wigglesworth's investigation of the Social Security number on the application, Detective Jessup then found that Brice had been arrested in 1991. Detective Jessup's investigative reports also indicated that Nkaru said that Brice, prior to the September 1994 incident, had attempted to cash a check in the name of a Chief Chris Ubani. The police then prepared an array of photographs of six African-American males, including Brice, and in November 1994, Nkaru selected Brice's photograph from the six-photograph array.

In December 1994, Detective Jessup obtained a warrant for Brice's arrest, and the authorities unsuccessfully attempted to execute the warrant at an address where Brice's family had previously resided. Because the family no longer resided there, Brice did not, at that time, learn of the warrant's existence.

B.

Over eighteen months later, in July 1996, Brice and his wife left the country for a Caribbean cruise and reentered the United States at its conclusion. As a result of the outstanding 1994 warrant, the National Airport police detained Brice for several hours and then transferred him to the Alexandria police. Brice was then arrested on the 1994 warrant. At a preliminary hearing in August 1996, both Detective Jessup and Nkaru testified on behalf of the Commonwealth, and a judge of the Alexandria General District Court found probable cause for the charge made in the warrant.

The preliminary hearing proceeding apparently triggered the memory of Brice's wife. She recalled that, in September 1994, she and her husband had taken a previous Caribbean cruise, and the couple

3

obtained documentation of their September 1994 travel schedule. Shortly thereafter, Brice's counsel provided the Commonwealth's Attorney with documentation from an airline, confirming that the Brices had entered the United States by plane on September 16, 1994, the day after the alleged Safeway incident. The Commonwealth's Attorney then moved the court to enter a nolle prosequi on the criminal action against Brice.[3]

C.

In February 1998, Brice brought this diversity action against Safeway and Nkaru, asserting several theories, including malicious prosecution. By the time of the trial, however, only the malicious prosecution count remained. Brice and his wife both testified about Brice's arrest and prosecution, and on the damages they claimed to have suffered as a result.[4] Detective Jessup and Officer Wigglesworth testified to the police department's investigation and reliance on information provided by Nkaru. Although portions of an August 1998 deposition of Nkaru were read into the record, Nkaru was not called as a trial witness.

The jury returned the $500,000 verdict in favor of Brice; after which Brice accepted the remittitur to $100,000. The district court then entered judgment and denied Nkaru's motion for judgment as a matter of law.

II.

We review de novo a district court's denial of a Rule 50(b) motion for judgment as a matter of law, viewing the evidence in the light

_____

[3] A nolle prosequi, in the Commonwealth of Virginia, if entered before jeopardy attaches, constitutes a dismissal of a criminal charge without prejudice. See, e.g., Cantrell v. Commonwealth, 373 S.E.2d 328, 333 (Va. Ct. App. 1988), overruled on other grounds by Carson v. Commonwealth, 404 S.E.2d 919, 921 (Va. Ct. App. 1991).

[4] These damages included out-of-pocket expenses incurred due to legal proceedings, as well as adverse and lingering effects in his relationships with his wife and children, in his reputation in his church, and in his employment.

most favorable to the prevailing party and drawing all reasonable inferences in his favor. See Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir. 1999) (citation omitted).

Under Virginia law, malicious prosecution is established by proof that a defendant: (1) instituted or procured a criminal prosecution of the plaintiff; (2) without probable cause; (3) acted maliciously; and (4) the prosecution was terminated in a manner not unfavorable to the plaintiff. See Cramer v. Crutchfield, 496 F. Supp 949, 953 (E.D. Va. 1980) (citation omitted) (noting that malicious prosecution actions are not favored in Virginia), aff'd, 648 F.2d 943 (4th Cir. 1981) (per curiam). Nkaru maintains that the district court erred by denying his motion for summary judgment, because he neither"instituted" nor "procured" the prosecution of Brice.

A.

In support of his argument for reversal, Nkaru contends that this case is controlled by the 1928 decision of the Supreme Court of Appeals of Virginia in King v. Martin, 142 S.E. 358 (Va. 1928). In King, the defendant notified the police that he and his mother were robbed at gunpoint inside his home. King gave the police a general description of the robber and informed them that he had not been able to distinguish the robber's features clearly. Several times King reviewed photographs of suspects, but was unable to identify the perpetrator. Later, King and his mother separately viewed a police line-up of suspects, at the authorities' request. The Kings positively identified Martin, but made no arrest request. However, the police sought and obtained a warrant for Martin's arrest and prosecuted him for having committed the robbery. After a trial in which King's mother equivocated on her prior positive identification of Martin, the jury acquitted Martin. Martin then sued King for malicious prosecution and obtained a $500 judgment.

The Supreme Court of Appeals of Virginia reversed the malicious prosecution judgment against King, holding that, as a matter of law, the evidence failed to show that King "instigated or caused or had anything to do with the prosecution except to appear as a witness when summoned." Id. at 126-27. The court reasoned that King unwillingly witnessed a crime and then placed himself entirely in the hands

5

of the duly constituted authorities. Id. at 127. The court concluded that "[n]ot one single active or voluntary step was taken by [King] at any stage of the proceedings," although he did respond to the authorities' requests for identification and he consistently stated his honest belief of Martin's identity as the robber. Id. , see also Marsh v. Commercial and Sav. Bank of Winchester, Va., 265 F. Supp. 614 (W.D. Va. 1967) (relying on King in dismissing malicious prosecution claim, holding that victim's honest cooperation with police is insufficient as a matter of law to constitute "institution" of the prosecution).

Nkaru contends that, like Mr. King, he did not institute or procure any criminal prosecution, because he did not take any active step in the proceedings. He simply reported the occurrence of a crime to the police and responded to police requests that he verify a suspect's identification. The police independently investigated the case, identified Brice as a suspect, and then constructed an array of photographs. After Nkaru selected Brice's photograph from the six-photograph array, the police -- not Nkaru -- sought and obtained the warrant that ultimately led to Brice's prosecution. Nkaru's testimony at Brice's preliminary hearing was that of a disinterested witness -- compelled by a subpoena issued by the Commonwealth's Attorney.

B.

Brice offers several reasons for his contention that we should affirm the trial court's judgment in his favor. The premise underlying all of his arguments is that he is innocent, i.e., the evidence of his reentry into the United States on September 16, 1994 precludes any possibility that he committed the offense of forging and uttering in Alexandria the previous day. We accept this assumption for purposes of our analysis.

1.

Brice attempts to distinguish the King decision based on Mr. King's apparent uncertainty in his identification of the criminal perpetrator. In contrast, Nkaru repeatedly affirmed to the authorities that he was confident of Brice's identity, and provided details of prior incidents to support his knowledge. Brice further points to the factual distinction that Nkaru selected Brice from police photographs, while Mr.

6

King could not identify a perpetrator from suspects' photographs offered by the police.

We find no authority supporting Brice's contention that a witness who provides the police with incorrect information during a criminal investigation ipso facto "institutes" or "procures" the prosecution if he provides that information unequivocally. As the King decision emphasized, the critical question is whether the witness provided the police with his honest or good faith belief of the facts. In King, the court distinguished the actions of Mr. King, a witness who acted in good faith and was thus shielded from civil liability, from those of a witness whose truthfulness was questionable because she demanded money from the suspect prior to reporting the matter to the police. See King, 142 S.E. at 361 (discussing Atkinson v. Birmingham, 116 A. 205 (R.I. 1922)).

Brice also maintains that Nkaru's affirmations deprived the authorities of the opportunity to intelligently and independently investigate the alleged 1994 offense. In support of this point, Brice refers to Detective Jessup's testimony that his investigation of the case primarily was based on information provided by Nkaru (that Nkaru recognized the individual as a person he had seen offer the Weir checks to a Safeway cashier), which Jessup believed. Prior to Brice's preliminary hearing, Jessup did not seek or obtain: the name of the Safeway cashier involved in the September 15, 1994 incident; the date that the Chief Chris Ubani incident allegedly occurred; or any information from other Safeway employees with personal knowledge of the Weir incidents. Jessup also made no effort to investigate the telephone number written on a Weir check.

We find nothing to demonstrate that Nkaru prevented law enforcement officials from investigating Brice further, had they elected to do so. And we are aware of no authority supporting the novel proposition that a witness, by honestly providing information to a law enforcement official, may be held responsible for the official's execution of his independent duty to investigate. See, e.g., Gramenos v. Jewel Cos., 797 F.2d 432, 434 (7th Cir. 1986) ("Police often arrest suspects on the basis of oral reports from witnesses, and the state may prosecute against the wishes of all witnesses."); King v. Massarweh, 782 F.2d 825, 828-29 (9th Cir. 1986) (injuries from arrest are not proxi-

7

mately caused by private party, absent some showing that private party "had some control" over state officials' decision).**5** In this case, Nkaru simply provided the police with information within his knowledge, and the police reasonably believed him. See id. at 439 (explaining that police have reasonable grounds to believe a guard at a supermarket, because there are inherent safeguards against the making of false charges in the institutional employment setting), see also 66 A.L.R. 3d Summary 10 § 3 (1975) (normally a malicious prosecution plaintiff must show that defendant did more than merely give information that included an identification, e.g., that he requested the initiation of proceedings, signed a complaint, or swore out an arrest warrant against plaintiff); 52 Am. Jur. 2d Malicious Prosecution § 23 (1970) (plaintiff must show defendant was affirmatively active in instigating or participating in the prosecution); id. § 24 (no liability for mistaken, but reasonable and in good faith, misidentification of perpetrator of crime). Cf. Cedars-Sinai Med. Center v. Superior Court, 253 Cal. Rptr. 561, 563-64 (Cal. Ct. App. 1988) (employees did not initiate or procure the arrest where, in an investigation which had already focused on plaintiff, authorities requested employees to identify voice on tape, and they genuinely believed it was plaintiff's voice). In this instance, there is simply no evidence that Nkaru controlled the decisions of the law enforcement officials with respect to the investigation and prosecution of Brice. And the lack of such evidence substantially undermines the effort to hold Nkaru civilly responsible for the prosecution of Brice.**6**

_____

**5** In any event, Jessup was not required to do more than he did during the criminal investigation, which was terminated at an early stage by the nolle prosequi decision. See, e.g., Wadkins v. Arnold, No. 99-1370, slip op. at 10-11 & n.7 (4th Cir. June 2, 2000) (citation omitted) ("Reasonable law enforcement officers are not required to`exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established.'"); Morrison v. United States, 491 F.2d 344, 346 (8th Cir. 1974) (officer's failure to investigate -- including not even looking at the allegedly counterfeit bill -- did not negate probable cause for arrest, as the police are not required to conduct a trial before making an arrest).

**6** In any event, there could be no liability based on Nkaru's testimony at the preliminary hearing, because witness absolute immunity applies to testimony given in a judicial proceeding. See , e.g., Briscoe v. LaHue, 460

8

2.

Brice also argues that events occurring after the Commonwealth Attorney's nolle prosequi decision permit a reasonable inference that Nkaru knowingly falsely identified Brice as the perpetrator of the September 15, 1994 incident. We also reject this contention, in that those events do not support an inference of Nkaru's bad faith.

Brice seeks support for his contention in that, notwithstanding the airline records demonstrating otherwise, Nkaru testified in his deposition that he "would be surprised" if Brice was not in the United States on September 15, 1994, and that he was very sure that Brice is the same man Nkaru saw on that date. Here, Brice appears to complain that Nkaru did not recant his identification of Brice when confronted with the evidence that Brice was not in the country. We do not find it unreasonable that Nkaru maintained his belief that he witnessed Brice commit the offense. Indeed, if this was his best recollection of the facts, Nkaru testified truthfully. See, e.g., Gramenos, 797 F.2d at 438 (citing Elizabeth F. Loftus, Eyewitness Testimony: Psychological Research and Legal Thought, 3 Crime and Justice: An Annual Review of Research 105 (1981)) (noting that eyewitness descriptions are notoriously full of honest inaccuracies).

Brice also points to Nkaru's failure to disclose, during his August 13, 1998 deposition or afterward, the name of the Safeway cashier

_____

U.S. 325, 335 (1983) (noting common law provided absolute witness immunity for all persons integral to the judicial process); Williams v. Hepting, 844 F.2d 138, 141-43 (3d Cir. 1988) (citing cases) (holding that preliminary hearing testimony is within the scope of witness absolute immunity); 50 Am. Jur. 2d Libel and Slander (1995) ("Publications made in the course of actions necessarily preliminary to judicial proceedings are absolutely privileged."); 60A Am. Jur. 2d Perjury § 132 (1988) (false testimony in a criminal action does not furnish a basis for civil suit by the criminal defendant). Cf. 81 Am. Jur. 2d Witnesses § 79 (1992) (at common law, a right of action for damages exists against a witness who, without sufficient excuse, fails or refuses to give oral testimony in obedience to a subpoena). However, our decision today need not rest on a witness immunity determination, because only a portion of Nkaru's conduct would be within its scope.

9

involved in the September 15, 1994 incident. However, there is no evidence that the cashier's identity was pursued by the police contemporaneous to the incident; in fact, Detective Jessup testified that his investigation did not reach this point. We decline to permit an inference of bad faith from a party's inability to produce detailed information about an event that occurred four years earlier.

Brice also asserts that Nkaru denied, in his deposition, having seen Brice in an Alexandria Safeway market prior to September 15, 1994, and also denied informing Officer Wigglesworth and Detective Jessup that he recognized the perpetrator from prior forgery incidents. The deposition testimony that Brice refers to is, to be charitable, confusing.**7** In that testimony, counsel (referring to Detective Jessup's investigation reports) repeatedly asked Nkaru to confirm that he told the police he saw Brice author the Weir checks, but Nkaru refused to do so. However, the police reports do not suggest that Nkaru witnessed Brice author the checks; instead, consistent with Nkaru's testimony, those reports indicate that "Nkaru stated that he witnessed Mr. Brice utter checks . . . ."**8** Nkaru also testified that he did not remember telling the police that the suspect used the name Chief Chris Ubani. Significantly, Nkaru's deposition was taken four years after the 1994 incident. His failure to recall under such circumstances is not suspiciously inconsistent with the police report's investigative record.

Brice further contends that Nkaru "refused to testify" during the civil trial, which permits the jury an adverse inference. See, e.g., Restatement of Torts, Second, § 1264 ("When it would be natural under the circumstances for a party to call a particular witness or take the stand as a witness in a civil case, . . . and the party fails to do so, tradition has allowed the adversary to use this failure as the basis for involving an adverse inference."). First, we reject the characterization that Nkaru "refused" to testify. A party is not obligated to testify on his own behalf at trial, and he and his counsel may make a reasoned

---

**7** At one point during the deposition, Nkaru -- who is not a native English speaker -- is so confused that he states that he saw Brice on November 29, 1993 and that on December 2, 1993, he saw Brice for the first time.

**8** To "utter" a check is to put or send it into circulation, or to publish or offer it. See Black's Law Dictionary 1547 (6th ed. 1990).

10

judgment of whether there is a need to do so. Of course, a party in a civil suit cannot generally refuse to testify if called by the opposing party. In this regard, it is significant that Brice could have, but did not, call Nkaru as a witness. See Teague v. Bakker, 35 F.3d 978, 994 n.22 (4th Cir. 1994) (citation omitted) (no adverse inference permitted when witness is equally available to either party). **9**

We are accordingly constrained to reject Brice's contention that there is sufficient evidence to support an inference that Nkaru acted in bad faith when he provided the law enforcement officials with information relating to Brice. Therefore, under these circumstances and consistent with the applicable authorities, we must conclude, as a matter of law, that Nkaru did not institute or procure the prosecution of Brice and that Brice cannot maintain his malicious prosecution action against Nkaru.**10**

III.

Pursuant to the foregoing, we reverse the judgment of the district court and remand for entry of judgment in favor of Nkaru and Safeway.

REVERSED AND REMANDED
_____

**9** Even if the witness were not equally available, without a forecast of material facts that were omitted from evidence by Nkaru's failure to testify, we can find no support for an adverse inference. See, e.g., Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 409, 432 n.10 (2d Cir. 1999) (adverse inference permitted when missing witness's testimony would be material); United States v. Warwick, 695 F.2d 1063, 1068 (7th Cir. 1982) (negative inference may not be drawn where the unpresented testimony would be merely cumulative).

**10** In light of our conclusion here, we need not address Nkaru's other assignments of error.

11