Brian HINMAN, Plaintiff,

v.

Jonathan JOYCE, and City and County of Denver, Colorado, Defendants.

Civil Action No. 15-cv-0751-WJM-MEH

United States District Court, D. Colorado.

Signed August 12, 2016

Raymond K. Bryant, Civil Rights Litigation Group, PLLC, Denver, CO, for Plaintiff.

Evan P. Lee, Baldwin Morgan & Rider, PC, Conor Daniel Farley, Hollie Renee Birkholz, Denver, CO, for Defendants.

## ORDER ON PENDING MOTIONS

William J. Martínez, United States District Judge

Plaintiff Brian Hinman ("Hinman") sues Denver Police Detective Jonathan Joyce ("Joyce") and the City and County of Denver ("Denver") for alleged violations of his constitutional rights when he was held in pretrial detention for ten months on suspicion of a crime he did not commit. (ECF

No. 69.) Currently before the Court are four motions:

1. Joyce's Motion for Judgment on the Pleadings (ECF No. 36), which attacks Hinman's original Complaint (ECF No. 1);

2. Denver's Motion to Dismiss (ECF No. 68), which attacks Hinman's Amended Complaint (ECF No. 61) under Federal Rule of Civil Procedure 12(b)(6);

3. Joyce's Motion to Dismiss (ECF No. 69), which also attacks Hinman's Amended Complaint under Rule 12(b)(6); and

4. Hinman's Motion for Leave to File Second Amended Complaint ("Motion to Amend") (ECF No. 85), which Hinman filed to supplement certain of his allegations in the event that the Court grants either of Denver's or Joyce's Motions to Dismiss.

For the reasons explained below, the Court rules as follows on these motions: Joyce's Motion for Judgment on the Pleadings is denied as moot in light of Hinman's Amended Complaint. Joyce's Motion to Dismiss is granted with respect to his claim of absolute immunity for testimony at a probable cause hearing, but denied as to his claim for qualified immunity based on information provided in a probable cause statement. Denver's Motion to Dismiss is denied in full given that Hinman states at least one viable theory of municipal liability. Finally, Hinman's Motion to Amend is denied as moot with respect to Hinman's claims against Denver, denied as moot with respect to Hinman's claims against Joyce based on the probable cause statement, and denied as futile with respect to Hinman's claims against Joyce based on the probable cause hearing because no amendment could overcome Joyce's absolute immunity in that context.

# I. RULE 12(b)(6) STANDARD

## A. General Standard

■ Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir.2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir.2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).

## B. Documents Outside the Pleadings

■ Joyce and Denver ask this Court to consider additional documents they have placed in the record, namely, Joyce's probable cause statement that led to Hinman's continuing detention (ECF No. 69-1), and the transcript of the probable cause hearing at which Joyce testified, and which resulted in a court ruling that Hinman would be bound over for trial (ECF No. 36-1). The Court may consider these documents if they are (1) "mentioned in the complaint," (2) "central to [the] claims [at issue]," and (3) not challenged as inauthentic. *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir.2013).[1] Here, all

---

1. "If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to

three elements are satisfied. Both Joyce's probable cause statement and his probable cause hearing testimony are discussed as bases of liability in the Amended Complaint. (*See* ECF No. 61 ¶¶ 28–31.) Thus, the statement and the hearing transcript are both "mentioned" and "central" to Hinman's claims. Moreover, Hinman does not argue that these documents are inauthentic. The Court will therefore consider them for purposes of the Rule 12(b)(6) analysis below. The Court notes, however, that it will consider these documents only as proof of what they say, not as proof that what they say is true.

## II. FACTS

The Court accepts the following facts as true for purposes of Joyce's and Denver's respective Motions to Dismiss.

### A. Hinman and Roberts

In October 2013, Hinman "was incarcerated in the Denver County Jail, serving a misdemeanor sentence for violation of a restraining order relating to his ex-girlfriend, Kendra Paquin." (ECF No. 61 ¶ 12.) Hinman

> shared a cell with three other inmates, with [whom] he blunderously shared information regarding the source of his legal troubles and the matters foremost on his mind, including the emotionally charged nature of his relationship with Ms. Paquin, Ms. Paquin's ritzy lifestyle of extravagance, and the property he had left in Ms. Paquin's home.

(*Id.* ¶ 14.)

One of Hinman's cellmates was a methamphetamine addict named Brien Roberts ("Roberts"). (*Id.* ¶ 15.) Roberts "was known to be an unreliable methamphetamine addict by the Denver Police Department." (*Id.* ¶ 16.) Roberts was also "a storyteller, and knew of Denver's willingness to provide reductions in sentences to those who appeared to cooperate and/or [sic] by providing information about others' crimes." (*Id.*) Roberts "wrote down information that Mr. Hinman and his cellmates talked about in casual conversation" so that he could combine that information with fabricated accusations of criminal intent, thus making the accusations seem more plausible. (*Id.* ¶ 18.)

### B. Roberts's Accusations

On October 5, 2013, Roberts managed to speak with Detective Joyce, to whom he told "a fantastic tale." (*Id.* ¶ 19.) Roberts said that he and Hinman had been otherwise alone in their cell for "approximately one hour" on the previous day, during which "Hinman had solicited [Roberts] to burglarize and murder [Paquin]." (*Id.*) This alleged solicitation "included detailed information about the purported setting of the Paquin residence surrounded by a security fence, [and] a purported hole in the security fence adjacent to a liquor store." (*Id.*) Roberts also added "true, innocent, information that he had quietly collected [from Hinman]," such as specific items of property that Hinman had left at Paquin's home, a description of Paquin's purses and jewelry, and a "note with contact information for Mr. Hinman, which Hinman wrote for all of the inmates in his cell, days earlier, but which Roberts alleged that Hinman wrote for him at the time of the agreement so he could contact and meet with him in Denver after the illegal deed

---

dismiss simply by not attaching a dispositive document upon which the plaintiff relied." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir.1997); *see also Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F.Supp.2d 919, 923 (N.D.Ill.1999)

("it would be totally wasteful to uphold a claim on the false premise created by less than complete documentation when the delayed consideration of the remaining documents would lead to dismissal of that claim").

was done." (*Id.* ¶ 20.) In conveying this information to Joyce, Roberts made clear that he wanted to be rewarded through early release from his sentence. (*Id.* ¶ 21.)

## C. Joyce's Visit to Paquin's Apartment Complex

Joyce knew that Roberts was a career criminal and capable of fabricating accusations if it would help him get out of jail sooner. (*Id.* ¶ 22.) Joyce "had serious doubts about the reliability of [Roberts], and the information [Roberts] provided." (*Id.*) Perhaps on account of this, Joyce personally visited the Paquin residence on October 8, 2013 (three days after speaking with Roberts). (*Id.* ¶ 23.) Joyce did not get the address from Roberts because "Roberts had failed to provide the address at which he had supposedly been asked to go." (*Id.*) Rather, Joyce found the address in police documents related to Hinman's prosecution. (*Id.*) When Joyce arrived, he learned—contrary to Roberts's claims—that there was no security fence. (*Id.* ¶ 23.) Rather, "there was only a, [*sic*] short fence surrounding the inner courtyard of the building." (*Id.*) In addition, "there was no liquor store adjacent to the building, as had been alleged by Roberts, and there was certainly no security gap in the fencing through which anyone could access the building." (*Id.*)

## D. Joyce's Additional Investigative Efforts

Sometime on that same day (October 8), Joyce "requested video surveillance of the Hinman/Roberts cell during the day that the [murder] solicitation was purportedly made." (*Id.* ¶ 25.) The video revealed that Hinman and Roberts "were only together, alone in the cell, during three independent periods of time lasting for 34 seconds, 115 seconds, and 55 seconds, respectively," during which time Hinman and Roberts were "incommunicative." (*Id.*)

Joyce then interviewed Hinman's two other cellmates, identified in the Amended Complaint as "Mr. Baxter and Mr. Journey." (*Id.* ¶ 26.) Baxter and Journey "both described the innocuous conversations through which Mr. Hinman had blunderously, but innocently, communicated general information about his ex-girlfriend." (*Id.*) Baxter and Journey also stated that Roberts "wanted to get out of jail and would do anything to get out, and that they did not believe [Hinman] was planning or had planned anything like what Mr. Roberts had asserted." (*Id.*) Moreover, Baxter and Journey informed Joyce that Hinman "had generally provided [his] contact information for them [*i.e.*, all of Hinman's cellmates, including Roberts] to keep in touch ... after they got out of jail." (*Id.*)[2]

2. In his reply in support of his motion to dismiss, Joyce denies having viewed the video or having spoken with Baxter or Journey before drafting the Probable Cause Statement described in Parts II.E and III.A.2, below. (ECF No. 93 at 6 nn.2–3.) Normally the Court would give no heed to such denials at this phase given that they are usually irrelevant in a Rule 12(b)(6) analysis. However, Joyce's denial nonetheless prompted the Court to re-examine Hinman's allegations regarding the video and regarding Joyce's conversations with Baxter and Journey. That re-examination has given the Court potential cause for concern. A major part of this case turns on what Joyce knew when he eventually submitted the Probable Cause Statement, on October 11,

2013. As to that question, the Amended Complaint at first provides specific dates on which Joyce learned specific details. (ECF No. 61 ¶¶ 19–25.) However, following the allegation regarding Joyce's October 8, 2013 "request[ ] [for] video surveillance of the Hinman/Roberts cell" (*id.* ¶ 25), the Amended Complaint becomes much more vague about what happened when. For example, the Amended Complaint contains no allegation regarding when Joyce *viewed* the video surveillance, as opposed to just requested it—although the allegation regarding the request is phrased such that the reader would likely conclude that Joyce requested and viewed the video on the same day. (*See id.* ("On or about October

## E. Arrest & Probable Cause Hearing

On October 9, 2013, Joyce moved Hinman to solitary confinement. (*Id.* ¶ 27.) On October 11, 2013—the date Hinman was scheduled to be released from his jail sentence—Joyce filed a "Statement of Probable Cause/Affidavit for Arrest Warrant" ("Probable Cause Statement"). (*Id.* ¶ 28; *see also* ECF No. 69-1.) The Probable Cause Statement details Roberts's accusations against Hinman, but says nothing about what Joyce learned from his own investigative efforts. (*See generally* ECF No. 69-1 at 1.)

On October 12, 2013, "a state court judge found probable cause for [Hinman's] continued detention based upon Defendant Joyce's statement of probable cause." (ECF No. 61 ¶ 29.) Hinman was denied bail and therefore remained in jail. (*Id.*)

On November 14, 2013, a state court judge held a hearing (the "Probable Cause Hearing") to decide "whether there existed probable cause to detain Mr. Hinman until trial." (*Id.* ¶ 30.) At this hearing, Joyce was the only witness, and he testified mostly regarding his investigation of Roberts's accusations. On direct examination, he stated

that Paquin's apartment building was "a gated community" because "the doors have buzzers," and he characterized that as "consistent" with Roberts's accusation that there was a security fence. (ECF No. 36-1 at 5.) Roberts also testified that there was a liquor store "on the block opposite" the apartment building. (*Id.*) Roberts further testified regarding what he saw in the jail surveillance video, describing "several points where both [Hinman and] Roberts are alone in the cell together." (*Id.* at 7.)

At this point, the presiding judge began asking about what the surveillance video showed. Due to those questions, Joyce clarified that there were only "three short periods ... where [Hinman and Roberts] were alone in the cell together." (*Id.*)

On cross-examination, Joyce agreed with Hinman's attorney that those three periods amounted to 34 seconds, 115 seconds, and 55 seconds, respectively. (*Id.* at 11.) Hinman's attorney also elicited agreement that Roberts's description of an adjacent liquor store with a hole through a security fence was not consistent with what Joyce saw at Paquin's apartment building. (*Id.*)

8, 2013, Detective Joyce requested video surveillance of the Hinman/Roberts cell during the day that the solicitation was purportedly made. The video showed . . . .").) The Amended Complaint also describes Joyce's discussions with Baxter and Journey as occurring only "in the days that followed" the supposed viewing of the video. (*Id.* ¶ 26.) But immediately after describing what Joyce learned from Baxter and Journey, the complaint returns to concrete temporality with an allegation about certain actions Joyce took "[o]n October 9, 2013," and finally with the Probable Cause Statement submitted on "October 10/11, 2013," from which Joyce omitted "the false and contradictory information that he discovered about [Roberts's] allegations during his investigation." (*Id.* ¶¶ 27, 28.) It appears, then, that the Amended Complaint has been intentionally structured to convey the impression that Joyce knew all of the previously mentioned information at the time he

drafted the Probable Cause Statement. (Hinman's proposed Second Amended Complaint contains the same allegations, presented in the same manner. *See* ECF No. 85-8 ¶¶ 19–29.) At this stage, the Court presumes that Hinman's counsel had a good faith basis for drafting the Amended Complaint as he did, and the Court will analyze probable cause under the assumption that Joyce drafted the Probable Cause Statement with knowledge of all of the exculpatory details alleged in the Amended Complaint, including those recounted in this Part II.D. If the Court later learns, however, that Hinman's counsel had no good faith basis for representing as much, the Court may consider sanctions under Federal Rule of Civil Procedure 11(c)(3). It would be ironic indeed if Hinman's counsel were manipulating and omitting material facts in an attempt to hold Joyce liable for manipulating and omitting material facts.

The presiding judge ultimately ruled that probable cause existed. The judge acknowledged that "much of this depends on the word of—of a fellow cellmate," but considered it "confirmed" that there was "opportunity for discussions [on the relevant] day" between Hinman and Roberts, even though those opportunities lasted only "a couple [of] minutes or so and [were] broken up into three or four different time periods." (*Id.* at 13.) This, said the judge, was enough to establish probable cause, at least without "getting into credibility issues," which the judge was apparently unwilling to do. (*Id.*)

## F. Eventual Release

The Denver District Attorney's office dismissed the charges against Hinman in July 2013, concluding "that there was a lack of evidence that the alleged crimes had been committed." (ECF No. 61 ¶ 32.) Hinman thus spent about ten additional months in jail, and thereby suffered lost wages and earning capacity and other "miscellaneous economic costs, inconveniences and injuries resulting from the charges." (*Id.* ¶ 33.)

## G. Joyce's Training

Hinman alleges a failure-to-train municipal liability theory against Denver. (ECF No. 61 ¶¶ 57–62.) Previously in this case, the Court granted Denver's motion to dismiss Hinman's failure-to-train claim, holding that Hinman had alleged no factual basis from which the Court could plausibly infer that Joyce's alleged unconstitutional actions resulted from Denver's inadequate training. (*See* ECF No. 34 at 4–6.) However, the Court further noted that "[d]iscovery with respect to Joyce could legitimately include discovery about the training he received," and that discovery could potentially provide a basis for amendment. (*Id.* at 6 n. 1.) The Court therefore dismissed

Joyce's claim against Denver without prejudice and extended his deadline to amend his complaint. (*Id.* at 6–7.)

Hinman then deposed Joyce, inquired about his training, and incorporated what he learned into his Amended Complaint. Hinman alleges the following in that regard:

Defendant Joyce had difficulty answering questions about the standards of trustworthiness and reliability of information required for assessments of probable cause. Defendant Joyce was forced to acknowledge that he had not been provided training/guidance by Denver in what steps he should take to investigate the veracity and/or reliability of an informant/witness. Joyce acknowledged that he had not been trained on a number of variables relating to informant/witness veracity and/or reliability that were at issue in the underlying case, including *inter alia* considerations relating to an informant's/witness's criminal history (including not only drug use, but also crimes of violence, and dishonesty), offers of information in exchange for a benefit (such as demands for early release offered in exchange for information) and/or the corroboration/contradictions of an informant's/witness's allegations during an investigation. Upon questioning, Joyce could not describe to what extent he should discount or otherwise categorize different types of information based upon whether evidence demonstrated that the allegations were credible or not. Joyce testified that he had not received training (and, indeed, was not aware of) the concept of "predictive details" in reference to the corroboration/refutation of informant/witness allegations, or "crimes of dishonesty" in relation to reliability of a

witness with an extensive criminal history.

Moreover, Defendant Joyce testified during deposition in a manner that suggested he had received insufficient training regarding his constitutional duty to affirmatively present all information regarding the possible existence of probable cause so that a neutral arbiter could make a determination with knowledge of the totality of the circumstances. Joyce testified that the training he had received from Denver regarding the presentation of information in a probable cause statement was that which he thought supported the existence of probable cause. He testified that he thought he should not present information regarding an informant's/ witnesses' background (which likely made the informant/ witness less credible/reliable) if it involved prior criminal activity/contacts with the Denver Police Department. Joyce testified that the only training he had received from Denver regarding testimony he should provide at a probable cause hearing was that which would appear neutral and responsive to questions asked of him during the hearing.

Further, when it came time to discuss his obligation to provide to the prosecutor the exculpatory video surveillance tape of the timeframe during which the purported solicitation occurred, he testified that he thought it was reasonable that he merely drop it off at the office of the prosecution as supplementary information related to the case—instead of highlighting that the video likely discounted, negated, and/or (more likely) vitiated the possible existence of probable cause to believe Hinman could have

committed the crimes alleged by Roberts.
(ECF No. 61 ¶¶ 36–38.)

## III. ANALYSIS

Hinman asserts that Joyce is personally liable for false arrest and malicious prosecution in violation of the Fourth Amendment. Hinman asserts that Denver is liable in its municipal capacity for failure to train Joyce properly. The Court will first discuss Hinman's potential personal liability, and then discuss Denver's potential municipal liability.

### A. Hinman's Personal Liability

#### 1. Probable Cause Hearing

█ Hinman's claims primarily focus on Joyce's allegedly misleading testimony at the Probable Cause Hearing. (*See* ECF No. 69 ¶¶ 30–31.) Joyce argues that he is absolutely immune from any § 1983 action arising out of his testimony given at that hearing. (ECF No. 69 at 12–14.) Hinman responds that the Tenth Circuit in *Anthony v. Baker*, 955 F.2d 1395 (10th Cir.1992), rejected absolute immunity in pretrial stages for "a complaining witness-officer who actively instigated or encouraged the prosecution during the pretrial process." (ECF No. 82 at 15.) In reply, Joyce contends that the Supreme Court effectively overruled *Anthony* in *Rehberg v. Paulk*, 566 U.S. 356, 132 S.Ct. 1497, 182 L.Ed.2d 593 (2012). (ECF No. 93 at 6–7.) The Court concludes that Joyce has the better of the argument.

The Supreme Court held in *Briscoe v. LaHue*, 460 U.S. 325, 326, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), that witnesses, including police officers, are absolutely immune from liability under § 1983 based on their *trial* testimony—even perjured trial testimony. In *Anthony*, however, the Tenth Circuit held that *Briscoe* did not extend to police officers testifying in grand jury proceedings or preliminary hearings [3]

---

**3.** The terms "preliminary hearing" and "probable cause hearing" are generally interchangeable. *See* 4 Wayne R. LaFave *et al.*, *Criminal Procedure* § 14.1(a) (4th ed., Dec.

2015 update) (listing the following as synonyms for "preliminary hearing", "preliminary examination," "probable cause hear-

to the extent a police officer was acting as a "complaining witness," as that term was understood at common law. 955 F.2d at 1398–1402. The Tenth Circuit reasoned, in part, that there was a significant distinction between "the constitutional tort of giving false testimony" (to which absolute immunity attached) and the "constitutional tort of a complaining witness initiating a baseless prosecution" (for which there was no tradition of absolute immunity). *Id.* at 1398–1399, 1400 n.4.

Joyce contends that the Supreme Court's recent *Rehberg* decision effectively overrules *Anthony*. The specific question at issue in *Rehberg* was whether law enforcement officials are absolutely immune under § 1983 for their testimony in grand jury proceedings (not preliminary hearings). 132 S.Ct. at 1500–01. The Supreme Court held that the justifications for absolute immunity for trial witnesses as discussed in *Briscoe* "apply with equal force to grand jury witnesses," and "[n]either is there any reason to distinguish law-enforcement witnesses from lay witnesses." *Id.* at 1505.

The Court specifically rejected any distinction based on "complaining witnesses" as compared to other witnesses, for three reasons. First, the historical title of "complaining witness" is a misnomer. The complaining witness was simply the "party who procured an arrest and initiated a criminal prosecution," and was not necessarily a "witness" in the sense of one who testifies in court. *Id.* at 1507. Second, those who testify before a grand jury do not procure arrest or prosecution; that decision usually remains in the prosecutor's discretion, who is absolutely immune from liability based on that decision. *Id.* at 1508. Third, there is no "workable standard for determining whether a particular grand jury witness is a 'complaining 'witness,' "

given that many witnesses may testify in front of the grand jury. *Id.* at 1508–09. "[W]hich [of those] witnesses would be 'complaining witnesses' and thus vulnerable to suit based on their testimony?" *Id.* at 1509.

The plaintiff in *Rehberg* nonetheless claimed that granting absolute immunity in grand jury proceedings would "create an insupportable distinction between States that use grand juries and those that do not." *Id.* "[I]t would make no sense," the plaintiff argued, "to distinguish for purposes of § 1983 immunity between prosecutions initiated by the return of a grand jury indictment and those initiated by the filing of a complaint or information," which can be done in twenty-six states. *Id.*[4]

In making this argument, the plaintiff was attempting to show the supposed absurdity of granting absolute immunity for grand jury testimony leading to an indictment, but not for paper testimony leading to an indictment. *See, e.g., Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir.1996) ("It is a violation of the Fourth Amendment for an arrest warrant affiant to knowingly, or with reckless disregard for the truth, include false statements in the affidavit, or to knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause." (internal quotation marks and citation omitted)). But the Supreme Court in *Rehberg* deemed the affidavit-vs.-grand-jury-testimony comparison to be

> the wrong analogy. In States that permit felony prosecutions to be initiated by information, the closest analog to a grand jury witness is a witness at a preliminary hearing. Most of the States that do not require an indictment for felonies provide a preliminary hearing at

---

ing," "commitment hearing," "examining trial," and "bindover hearing").

4. Colorado is one of those twenty-six states. *See* Colo. Rev. Stat. § 16–5–205(1).

which witnesses testify. The lower courts have held that witnesses at a preliminary hearing are protected by the same immunity accorded grand jury witnesses, see, *e.g.*, *Brice v. Nkaru*, 220 F.3d 233, 239, n. 6 (C.A.4 2000); *Curtis v. Bembenek*, 48 F.3d 281, 284–285 (C.A.7 1995) (citing cases), and petitioner does not argue otherwise, see Tr. of Oral Arg. 51.

*Rehberg*, 132 S.Ct. at 1509–10. The Supreme Court reasoned, in essence, that there will be no "insupportable distinction between States that use grand juries and those that do not" because, according to its own research and the lack of contrary assertion from the petitioner, the lower courts have already decided that witnesses at preliminary hearings receive absolute immunity.

Surprisingly, however, the two Court of Appeals cases cited for this proposition show that the lower courts are not unanimous. The Fourth Circuit's *Brice* decision cites (apart from treatises) only a Third Circuit decision, *Williams v. Hepting*, 844 F.2d 138 (3d Cir.1988), and that decision explicitly acknowledges and disagrees with the Tenth Circuit's *Anthony* decision, as well as a similar Fifth Circuit decision, *id.* at 143. And the Seventh Circuit's *Curtis* decision distinguishes *Anthony* as relevant only to malicious prosecution, not the false arrest theory that the court deemed to be at issue in that case. *Curtis*, 48 F.3d at 286. This is a quizzical distinction given the Seventh Circuit's holding, earlier in its opinion, that police officers are "entitled to absolute immunity" for "testimony at ... the preliminary hearing." *Id.* at 285. It is frankly difficult to understand how that immunity would change based on the precise theory of liability. It nonetheless demonstrates a lack of unanimity among the lower courts on that question, at least when malicious prosecution is at issue, as it was in *Rehberg*.[5] Notwithstanding, the Supreme Court's citation to *Curtis* is accurate to the extent that *Curtis* is meant to represent the *majority view* among the circuits, *i.e.*, that witnesses should receive absolute immunity for their testimony without regard for whether they testify in an investigatory, pretrial, or trial proceeding. *See* 48 F.3d at 284–85.

Thus, *Rehberg* sends mixed signals on the question of absolute immunity for preliminary hearing witnesses. On the one hand, when faced with the allegation of an "insupportable distinction" between grand jury states and preliminary hearing states, the Court did *not* shrug it off as the price of federalism, but instead attempted to show that no such distinction existed. This strongly suggests that the Court agreed with the petitioner that such a distinction would indeed be "insupportable." On the other hand, the Court's own citations show that the distinction exists in a minority of jurisdictions, and the Court does not explicitly disapprove of the minority view.

In January of this year, the Tenth Circuit issued an unpublished disposition that purports to announce *Anthony*'s effective overruling by *Rehberg*. *See Handy v. City of Sheridan*, 636 Fed.Appx. 728 (10th Cir. 2016). *Handy* was a § 1983 malicious prosecution case based, in part, on police officers' preliminary hearing testimony. In *Handy*, the Tenth Circuit concluded that *Anthony* no longer controlled because *Rehberg* "squarely rejected" *Anthony*'s distinction "between officials who testify as ordinary witnesses cloaked with absolute immunity and those who testify as complaining witnesses exposed to § 1983 liability." *Id.* at 742.

---

5. Although the Supreme Court's *Rehberg* opinion discusses malicious prosecution, it nowhere explicitly states that this was the plaintiff's legal theory. The Eleventh Circuit's underlying opinion, however, makes this explicit. *See* 611 F.3d 828, 836 (11th Cir.2010).

As an unpublished disposition, *Handy* sets no precedent. *See* 10th Cir. Rule 32.1. Nonetheless, the Court is persuaded that *Handy* is correct. The *Anthony* decision rested on a legal construct—the "complaining witness"—that *Rehberg* declared to have no continuing relevance in the context of in-court witness testimony. *See Anthony*, 955 F.2d at 1398–1402. If the complaining witness/lay witness distinction no longer exists, then the foundation of *Anthony*'s reasoning no longer exists, as *Handy* concluded. This Court would also add that *Rehberg*, at a minimum, strongly signaled disapproval of any decision that would permit liability for preliminary hearing testimony, given that it would create a distinction between preliminary hearing states and grand jury states that the Supreme Court claimed did not exist.

In short, following *Rehberg*, Joyce is absolutely immune for any liability allegedly flowing from his testimony at the Probable Cause Hearing. Hinman's claims against Joyce will be dismissed to that extent.[6]

### 2. Probable Cause Statement

█ Hinman argues that Joyce can also be liable for his allegedly deficient Probable Cause Statement. (ECF No. 61 ¶¶ 28–29, 43, 48.) *Rehberg* itself acknowledged that police officers remain potentially liable for false arrest and/or malicious prosecution based on material misstatements or omissions in warrant-seeking affidavits, probable cause statements, and similar written submissions. 132 S.Ct. at 1507 n. 1. Thus, it is still "a violation of the Fourth Amendment for an arrest warrant affiant to knowingly, or with reckless disregard for the truth, include false statements in the affidavit, or to knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause." *Wolford*, 78 F.3d at 489 (internal quotation marks and citation omitted).

█ When a plaintiff accuses a defendant of including false statements in a warrant affidavit, "the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit." *Id.* When a plaintiff accuses the defendant of omitting material information from a warrant affidavit, "the existence of probable cause is determined by examining the affidavit as if the omitted information had

---

**6.** Five days after issuing its unpublished *Handy* decision, the Tenth Circuit issued a published decision distinguishing *Rehberg*, but on grounds inapplicable here. *See Sanchez v. Hartley*, 810 F.3d 750, 755 (10th Cir.2016), *petition for cert. filed*, No. 15–1281. *Sanchez*, over which the undersigned presides in this Court, is a § 1983 malicious prosecution case alleging that police officers extracted a confession from a suspect and then used that confession to institute a prosecution against him while knowing the confession was highly suspect. *See id.* at 753. The *Sanchez* complaint contains allegations regarding police officers' reliance on the allegedly false confession in preliminary hearing testimony. *See Sanchez v. Hartley et al.*, Case No. 13–cv–1945, ECF No. 24 ¶¶ 81–84 (D. Colo, Sept. 9, 2013). However, as the undersigned stated in a prior order in that case, Sanchez's claim is principally based on false statements in affidavits and other written documents supporting his arrest, not on the officers' preliminary hearing testimony. *See Sanchez v. Hartley*, 65 F.Supp.3d 1111, 1121 (D.Colo.2014). On appeal from the undersigned's denial of qualified immunity, the Tenth Circuit recognized as much and therefore rejected the officers' absolute immunity argument based on *Rehberg* (an argument, incidentally, that was not raised before the undersigned). *See* 810 F.3d at 755 ("Mr. Sanchez's allegations relate to the defendants' conduct before Mr. Sanchez was charged, not testimony before a grand jury. Thus, *Rehberg* does not undermine our precedents allowing recovery under § 1983 for malicious prosecution based on violation of the Fourth Amendment."). *Sanchez* accordingly has no relevance here.

been included and inquiring if the affidavit would still have given rise to probable cause for the warrant." *Id.* (internal quotation marks omitted).

■ Probable cause—the ultimate touchstone—exists where

> the facts and circumstances within the arresting officer's knowledge and of which [the officer] had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to have the belief that an offense has been or is being committed by the person to be arrested. This is an objective standard, and thus the subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive. Whether a reasonable officer would believe that there was probable cause to arrest in a given situation is based on the totality of the circumstances.

*Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir.2011) (internal quotation marks and citations omitted; alterations incorporated).[7] When an arrest is approved by a judicial officer based on a warrant affidavit or probable cause statement, this totality-of-the-circumstances test focuses on "the totality of the circumstances as detailed in the [statement]." *United States v. Pulliam*, 748 F.3d 967, 971 (10th Cir. 2014).[8]

In that light, the relevant portion of the Probable Cause Statement reads as follows:

> It was reported that [Hinman] wanted several items of his from [Paquin's] home, including two laptop computers, an external hard drive, and some camera equipment that contained irreplaceable negatives. As compensation for the burglary[,] Hinman suggested that the perpetrator could steal from [Paquin's]

7. Joyce cites *Puller v. Baca*, 781 F.3d 1190, 1200 (10th Cir.2015), for the notion that probable cause is "something more than bare suspicion." (ECF No. 69 at 7, 8.) Denver, in its motion to dismiss, similarly draws on *Puller*. (ECF No. 68 at 12.) *Puller* indeed contains this "more than bare suspicion" articulation, citing *United States v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir.2011), which derives it from this parenthetical quote of *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir.1999), as part of a string of citations about the inability to reduce probable cause to a precise formula: "[T]he requisite 'fair probability' is something more than a bare suspicion, but need not reach the fifty percent mark." The original point of the quote, then, is *not* to define probable cause as anything more than a bare suspicion—which would make the test virtually indistinguishable from the "reasonable suspicion" test for an investigatory detention. *See, e.g., United States v. McHugh*, 639 F.3d 1250, 1255–56 (10th Cir.2011) (reasonable suspicion for investigatory detention requires "something more than an inchoate and unparticularized suspicion or hunch," but "considerably less [suspicion] than ... that required for probable cause" (internal quotation marks omitted)). Thus, whatever *Puller* meant

to say about probable cause, *Puller* could not overrule decades of precedent setting a higher bar than something more than bare suspicion. "[O]ne panel of the [Tenth Circuit] may not overrule another." *United States v. Hargus*, 128 F.3d 1358, 1364 (10th Cir.1997). The Court has therefore ignored Joyce's and Denver's arguments that what Joyce knew rose above the "bare suspicion" level and therefore supposedly established probable cause.

8. Thus, the Court ignores Joyce's argument regarding all of the other supposedly corroborated details he knew at the time he submitted the Probable Cause Statement, but failed to include. (*See, e.g.*, ECF No. 93 at 5.) Joyce cites no authority for the notion that a Probable Cause Statement should be reviewed in light of *everything* the officer omitted from it, both supportive and unsupportive of probable cause. In any event, from Hinman's perspective, these additional details (*e.g.*, about Paquin's appearance, employment, and the car she drives) were all details that Roberts learned through Hinman's "blunderous" disclosures to his cellmates generally, and Joyce allegedly had reason to suspect as much in light of his conversations with Baxter and Journey.

valuable designer purse and jewelry collections. [Hinman] also specifically suggested a particularly valuable piece of jewelry which he described as "a baby's foot pendant necklace by Erin Bosch [SIC][9] worth about $7800". In exchange for mediating the deal, [Roberts] was promised a food stamp card with a balance of $800–1000 once [Hinman] received his items from the burglary.[10] He offered to provide additional information, including a layout of [the] target area, should it be required, for [Roberts] to pass along [to the hitman]. [Hinman] also provided [Roberts] with contact telephone numbers and an email address so that they could communicate once they were both released, but asked that the deed be completed while he was still incarcerated so that it would not be linked to him.

(ECF No. 69-1 at 1.) This information simply repeats some of what Roberts told Joyce. Notably, Joyce omitted all of the following:

- Roberts had asked for a sentence reduction in exchange for the information provided;
- Roberts reported that Paquin's apartment building could be accessed through a hole in a security fence between the building and an adjacent liquor store, but there was no adjacent liquor store and no security fence, much less a hole any fence;
- jail surveillance video showed that Hinman and Roberts had not been alone for one hour (as Roberts reported), but rather had only three opportunities of 34 seconds, 115 seconds, and 55 seconds, respectively, in which Hinman could have confidentially conveyed the elaborate details reported by Roberts—and the two were not visibly communicative during those three time periods;
- none of Hinman's other cellmates believed Roberts's accusations, and instead opined that Roberts would say anything to get out of jail early; and
- Hinman's other cellmates confirmed that Hinman had talked to them generally about some of the details of his relationship with Paquin, and had also given his contact information to all of them.

Assuming Hinman's allegations to be true, the Court concludes that a jury could find a lack of probable cause in light of what Joyce omitted. *See DeLoach v. Bevers*, 922 F.2d 618, 623 (10th Cir.1990) ("We have long recognized that it is a jury question in a civil rights suit whether an officer had probable cause to arrest."). Moreover, the exculpatory nature of what Joyce learned through his own investiga-

9. So in original. Likely referring to Aaron Basha.

10. The Amended Complaint does not mention this food stamp card. Joyce, for his part, asserts that he shored up his probable cause to arrest by confirming the existence of the food stamp card (although apparently not the value of the card) through a search warrant executed against Hinman's wallet, which was in Denver Sheriff's Department custody. But the search warrant affidavit, which Joyce put into the record here, states that it was approved by a judge at 2:55 p.m. on October 11, 2013. (ECF No. 69-1 at 7.) The Probable Cause Statement, by contrast, states that it was completed at 11:00 a.m. on that same day, *i.e.*, about four hours before the search warrant could have been lawfully executed. (*Id.* at 1.) Moreover, the Probable Cause Statement says nothing about the search warrant, and therefore it the results of the search warrant could not have informed the judge that reviewed the Probable Cause Statement and thereby approved Hinman's continuing detention. The Court has accordingly ignored Joyce's (and Denver's) arguments based on what Joyce learned when he executed the search warrant.

tion and the lack of such details in the Probable Cause Statement is enough to raise an inference that Joyce acted intentionally or recklessly when he omitted those details. Thus, Hinman has properly pleaded a Fourth Amendment claim against Joyce.

■ Even accepting as true that Joyce behaved as Hinman alleged, Joyce may still enjoy qualified immunity if it was not clearly established in October 2013 that his behavior would violate an individual's constitutional rights. *See Ashcroft v. al–Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ("Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." (internal quotation marks omitted)).[11]

Joyce's Motion to Dismiss does not actually argue that he is qualifiedly immune from liability flowing from his Probable Cause Statement. Rather, Joyce's attacks on the "clearly established" prong of qualified immunity focus entirely on his testimony at the Probable Cause Hearing. (ECF No. 69 at 14–15.) Joyce's reply brief, however, offers an argument specific to the Probable Cause Statement. (ECF No. 93 at 8–9.) The Court could deem the argument waived for failure to raise it in the motion itself, but since it fails on its merits anyway, the Court will address it directly.

Joyce argues that Hinman has failed "to point to any law which demonstrates that it was clearly established that Detective Joyce was constitutionally required to include the information which he omitted from the probable cause [statement]." (*Id.* at 8.) But that is not Hinman's burden.

Particularly in a omission-based Fourth Amendment case such as this, it is unrealistic to expect any plaintiff to find a prior case in which the same constellation of facts was present and the same subset of facts was omitted. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir.2004) (McConnell, J.) ("The degree of specificity required from prior case law depends in part on the character of the challenged conduct. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").

The question is whether it was clearly established at the time that Joyce submitted the Probable Cause Statement that he would violate the Fourth Amendment by omitting material facts which, if included, would have undermined probable cause. That has been clearly established in the Tenth Circuit since at least 1990, when the Tenth Circuit explicitly approved other circuits' reasoning with respect to material omissions. *See Stewart v. Donges*, 915 F.2d 572, 582–83 (10th Cir.1990). It m ay have been clearly established even earlier than that. *See Pierce*, 359 F.3d at 1298 (denying qualified immunity despite the absence of a factually similar case because "[n]o one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest"); *see also DeLoach*, 922 F.2d at 623 (discussing liability for probable cause affidavit that failed to include "information garnered from a number of witnesses which tended to contradict the officer's allegations" (in-

---

11. The preceding analysis establishes the first element of this test and so the Court need not analyze it independently.

ternal quotation marks omitted; alterations incorporated)).

Thus, Joyce is not entitled to qualified immunity at the pleading phase. His motion to dismiss is therefore denied to the extent Hinman's Fourth Amendment claim rests on the Probable Cause Statement.[12]

**B. Denver's Failure-to-Train Liability**

■■■■ Hinman also seeks to hold Denver responsible for his injuries under the municipal liability theory first expounded in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under *Monell*, municipalities can be liable in § 1983 for damages when the municipality's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Id.* at 694, 98 S.Ct. 2018. Hinman argues that Denver allegedly failed to train Joyce adequately, and under circumstances that would create *Monell* liability. (ECF No. 83 at 2.)

■■■■ "[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for [municipal] liability under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. 1197.

■■■■ But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*,

563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). Thus, the fact

[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*City of Canton*, 489 U.S. at 390–91, 109 S.Ct. 1197. Given all this, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate [the municipality's] deliberate indifference for purposes of [a] failure to train [claim]." *Connick*, 563 U.S. at 62, 131 S.Ct. 1350 (internal quotation marks omitted).

■■■ Notwithstanding, the Supreme Court has left open the possibility that a single violation (rather than a pattern) can lead to failure-to-train liability when, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the

---

12. Given the Court's absolute immunity analysis in Part III.A.1, above, it appears that damages recoverable from Joyce would be limited to whatever losses Hinman incurred in the time period between October 11, 2013 (when Joyce prevented Hinman's release) and the probable cause hearing approximately one month later. However, the Court need not definitively resolve that question at this stage.

inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390, 109 S.Ct. 1197; *see also Connick*, 563 U.S. at 63–64, 131 S.Ct. 1350. The Court provided the following hypothetical example:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*City of Canton*, 489 U.S. at 390 n. 10, 109 S.Ct. 1197 (citation omitted).

Hinman argues that various alleged deficiencies in Joyce's training—and by inference, all Denver police detectives' training—were so obvious that the lack of training displays Denver's deliberate indifference. (ECF No. 83 at 4–6.) The Court has reservations regarding Hinman's allegations of failure to train in matters such as, *e.g.*, "considerations relating to an informant's/witness's criminal history (including not only drug use, but also crimes of violence, and dishonesty)," or "the concept of 'predictive details' in reference to the corroboration/refutation of informant/witness allegations." (ECF No. 61 ¶ 36.) This sort of allegation shades toward a call for "better or more training, sufficient to equip [the officer] to avoid the particular injury-causing conduct," which the Supreme Court has deemed an insufficient basis for a failure-to-train claim. *City of Canton*, 489 U.S. at 391, 109 S.Ct. 1197.

At this phase, however, the Court need not decide as a matter of law which of Hinman's failure-to-train theories are via-

ble. The Court sees at least one theory that could succeed under *City of Canton*'s "so obvious" rubric, and that is sufficient to avoid dismissal under Rule 12(b)(6). Specifically, Hinman alleges that Joyce was unaware of his duty, when drafting a probable cause statement, to disclose material information that tended to show an absence of probable cause, not just information that supported probable cause. (ECF No. 61 ¶ 37 ("Joyce testified that the training he had received from Denver regarding the presentation of information in a probable cause statement was [to present] that which he thought supported the existence of probable cause.").)

 Police officers do not have a duty to draft probable cause statements to include literally everything they have learned from an investigation. Nor is a probable cause statement deficient *per se* if the police officer fails to include every known inconsistency or other fact possibly negating the existence of probable cause. *See Easton v. City of Boulder*, 776 F.2d 1441, 1445, 1448–51 (10th Cir.1985) (affirming summary judgment in favor of officers whose arrest affidavit did "not give all the information known to the police at the time it was prepared" and omitted inconsistencies between certain witnesses' accounts of the alleged crime). But if, as alleged, Denver police detectives are trained to draft probable cause statements without reference to exculpatory information (either because they are specifically instructed not to include it, or because the training consistently fails to discuss it), then Denver faces a situation in which "the need for more or different training is so obvious" because the lack of such training is "likely to result in the violation of constitutional rights." *City of Canton*, 489 U.S. at 390, 109 S.Ct. 1197.

Police officers routinely draft probable cause statements and affidavits in support

of warrants, and these documents are some of the most significant documents in the criminal justice process. Judges often rely upon them, and only them, to perform the essential Fourth Amendment task of determining whether the government can deprive an individual of liberty or property based solely on *suspicion* that the individual committed a crime. The process requires impeccable integrity, and it has therefore been established for decades that law enforcement officers violate the Fourth Amendment when their material omissions mislead a judge to find probable cause where it otherwise would not have existed. If Denver in fact fails to train its officers on what is required in this process, Denver is inviting Fourth Amendment violations.

Hinman's allegations plausibly suggest that Joyce was not trained on the legally appropriate processes to follow at this constitutionally critical juncture of our criminal justice system. At the pleading phase, that is enough to infer that Denver generally does not provide such training. Thus, Hinman's Amended Complaint sufficiently states a failure-to-train theory against Denver. Denver's motion to dismiss will therefore be denied.

### C. Motion to Amend

Given this disposition, very little analysis is necessary concerning Hinman's Motion to Amend. Hinman's current complaint (his Amended Complaint) adequately states a cause of action against Denver. It also adequately states a cause of action against Joyce with respect to the Probable Cause Statement, and no amendment could overcome Joyce's absolute immunity for his testimony at the Probable Cause Hearing. Thus, the Motion to Amend will be denied as moot as to theories of liability that are already going forward, and denied as futile as to any theory of liability based on Joyce's testimony at the Probable Cause Hearing. *See, e.g., Watson ex rel. Watson*

*v. Beckel*, 242 F.3d 1237, 1239–40 (10th Cir.2001) ("A proposed amendment is futile if the complaint, as amended, would be subject to dismissal for any reason . . . .").

### IV. CONCLUSION

For the reasons set forth above the Court ORDERS as follows:

1. Joyce's Motion for Judgment on the Pleadings (ECF No. 36) is DENIED AS MOOT;

2. Denver's Motion to Dismiss (ECF No. 68) is DENIED;

3. Joyce's Motion to Dismiss (ECF No. 69) is GRANTED with respect to any claim against him based on his testimony at the Probable Cause Hearing, and is otherwise DENIED; and

4. Hinman's Motion for Leave to File Second Amended Complaint (ECF No. 85) is DENIED AS FUTILE with respect to any claim based on Joyce's testimony at the Probable Cause Hearing, and otherwise DENIED AS MOOT.